**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DENNIS TROTTER | : | |
| and | : | |
| CHRISTINA JOHNSTEN, | : | CIVIL ACTION NO. 2:20-cv-00570-JMG |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED LUTHERAN SEMINARY | : | |
| and | : | |
| DR. RICHARD GREEN | : | |
| and | : | |
| JAMES DUNLOP, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

STEVENS & LEE
Brad M. Kushner (ID No. 307429)
bmk@stevenslee.com
1500 Market Street, Suite 1800
Philadelphia, PA 19102
Phone: (215) 751-1949

Attorneys for Defendants

## **TABLE OF CONTENTS**

Page

I. PROCEDURAL HISTORY AND INTRODUCTION.................................................1

II. FACTS ................................................................................................................1

    A. Plaintiffs Are Hired by ULS's Predecessor Seminaries and Placed In Newly-Created Positions After The Consolidation Of The Seminaries...................................1

    B. The Board of Trustees Selects Bishop Dunlop as Acting President. ..............................3

    C. Plaintiffs' Attorney Submits Grievance Letters On Their Behalf. ..................................8

    D. The Board Selects Dr. Green as Interim President While Their Search for a Permanent President Continues...................................................................................9

    E. ULS Takes Measures to Avoid Bankruptcy Including a Staff Reorganization. .............10

    F. ULS Withdraws Job Postings It Could Not Afford Because Of Its Financial Distress. ........................................................................................................................14

III. ARGUMENT ....................................................................................................15

    A. The Court Should Dismiss Reverend Johnsten's Claims Because They Are Barred Under The Ministerial Exception. ...................................................................15

    B. The Court Should Grant Summary Judgment for Bishop Dunlop and Dr. Green On Counts I and III Because Title VII and the ADEA Do Not Provide For Individual Liability.........................................................................................................19

    C. The Court Should Grant Summary Judgment For Defendants On the Remainder of Plaintiffs' Retaliation Claims..............................................................................20

        1. Bishop Dunlop did not retaliate against Mr. Trotter. ...........................................21

        2. Dr. Green did not retaliate against Plaintiffs when he included their positions in a reorganization. ..............................................................................28

        3. ULS did not retaliate against Reverend Johnsten when it did not hire her for the Director of Student Services or Director of Admissions Positions................................................................................................................36

    D. The Court Should Grant Summary Judgment For Defendants On Plaintiffs' Retaliatory Hostile Work Environment Claim. .........................................................38

        1. Mr. Trotter did not experience an actionable hostile work environment..............39

        2. Reverend Johnsten cannot show that she suffered an actionable hostile work environment. .............................................................................................42

IV. CONCLUSION .................................................................................................43

## TABLE OF AUTHORITIES

**CASES**

*Aman v. Cort Furniture Rental Corp.*,
    85 F.3d 1074 (3d Cir.1996)............................................................................31

*Andreoli v. Gates*,
    482 F.3d 641 (3d Cir.2007)............................................................................20

*Artis v. Francis Howell N. Band Booster Ass'n, Inc.*,
    161 F.3d 1178 (8th Cir. 1998) ......................................................................30

*Atkinson v. Lafayette College*,
    653 F. Supp. 2d 581 (E.D. Pa. 2009) .....................................................21, 22

*Barber v. CSX Distribution Services*,
    68 F.3d 694 (3d Cir. 1995)............................................................................31

*Besko v. New Jersey Juvenile Justice Comm'n*,
    558 Fed.Appx. 295 (3d Cir. 2014) ...............................................................38

*Blakney v. City of Phila.*,
    559 Fed.Appx. 183 (3d Cir. 2014) ..........................................................32, 33

*Bradford v. UPMC*,
    2008 WL 191706 (W.D.Pa. Jan. 18, 2008)..................................................23

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 126 S.Ct. 2405 (2006)..........................................................24, 38

*Cardenas v. Massey*,
    269 F.3d 251 (3d Cir.2001)...........................................................................39

*Chughtai v. Jeanes Hosp.*,
    No. 11-4173, 2012 WL 4459592 (E.D.Pa., Sept. 26, 2012) .......................38

*Clark County v. Breeden*,
    532 U.S. 268, 121 S.Ct. 1508 (2001) (per curiam)......................................31

*Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*,
    450 F.3d 130 (3d Cir. 2006)......................................................................29, 30

*Daniels v. Sch. Dist. Of Phila.*,
    776 F.3d 181 (3d Cir. 2015)..........................................................................33

*Davis v. Davis Auto, Inc.*,
    509 Fed.Appx. 161 (3d Cir. 2013) ...............................................................35

SL1 1683120v1 110202.00004

*Elizan v. Milton Hall Surgical Associates, Inc.*,
No. 1:08-CV-2249, 2010 WL 11500752 (N.D.Ga. March 5, 2010)......................................41

*Eng v. Scranton UC Service Center*,
No. 3:CV-08-1213, 2009 WL 10718764 (M.D.Pa. July 22, 2009) ........................................41

*Fullard v. Argus Research Labs., Inc.*,
No. CIV.A. 00–509, 2001 WL 632932 (E.D. Pa. June 6, 2001) (same under
§1981) .......................................................................................................................................20

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)..............................................................................................................21, 23

*Hennessey v. Dollar Bank, FSB*,
833 Fed.Appx. 961 (3d Cir. 2020)..........................................................................................36

*Hightower v. Easton Area School Dist..*,
818 F.Supp.2d 860 (E.D.Pa. 2011) ..........................................................................................27

*Hill v. Borough of Kutztown*,
455 F.3d 225 (3d Cir.2006).......................................................................................................19

*Hosanna-Tabor Evangelical Lutheran Church School v. EEOC*,
565 U.S. 171 (2012).................................................................................................................16

*Jensen v. Potter*,
435 F.3d 444 (3d Cir. 2006)......................................................................................................38

*Jones v. SEPTA*,
796 F.3d 323 (3d Cir. 2015)......................................................................................................20

*Kelly v. Drexel University*,
907 F.Supp. 864 (E.D.Pa. 1995) ..............................................................................................35

*Kelly v. Drexel University*,
94 F.3d 102 (3d Cir. 1996)........................................................................................................36

*Kenney v. Footlocker Worldwide*,
55 Fed.Appx. 35 (3d Cir. 2002)................................................................................................36

*Koenke v. Saint Joseph's Univ.*,
No. 19-4731, 2021 WL 75778 (E.D. Pa. Jan. 8, 2021)............................................................16

*Kokinchak v. Postmaster General of the United States*,
677 Fed.Appx. 764 (3d Cir. 2017)...........................................................................................40

*Komis v. Sec. of Labor*,
918 F.3d 289 (3d Cir. 2009)................................................................................................*39, 40*

*Krouse v. Am. Sterilizer Co.*,
    126 F.3d 494 (3d Cir. 1997).................................................................................20

*Lamb–Bowman v. Delaware State University*,
    152 F.Supp.2d 553 (D.Del. 2001)......................................................................30

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
    903 F.3d 113 (3d Cir. 2018)..........................................................................16, 19

*Lula v. Network Appliance*,
    255 Fed.Appx. 610 (3d Cir. 2007).....................................................................38

*McGuckin v. Brandywine Realty Trust*,
    185 F. Supp. 3d 600 (E.D. Pa. 2016).................................................................20

*Miller v. CIGNA Corp.*,
    47 F.3d 586 (3d Cir. 1995)................................................................................20

*Moore v. City of Philadelphia*,
    461 F.3d 331 (3d Cir.2006)...............................................................................41

*Moore v. Shinseki*,
    487 Fed.Appx. 697 (3d Cir. 2012).....................................................................32

*N'Jai v. Floyd*,
    386 Fed.Appx. 141 (3d Cir. 2010).....................................................................19

*Nelson v. Upsala College*,
    51 F.3d 383 (3d Cir.1995)............................................................................29, 30

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75, 118 S.Ct. 998 (1998).....................................................................41

*Our Lady of Guadalupe School v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020)..............................................................15, 16, 18, 19

*Shellenberger v. Summit Bancorp, Inc.*,
    318 F.3d 183 (3d Cir. 2003)..............................................................................32

*Sheridan v. E.I. DuPont de Nemours and Co.*,
    100 F.3d 1061 (3d Cir. 1996).............................................................................19

*Small v. KS Engineers PC*,
    No. 08–3458, 2010 WL 1705002 (D.N.J. Apr. 26, 2010)....................................41

*Spangler v. City of Philadelphia*,
    No. 10–3434, 2012 WL 1835599 (E.D.Pa. May 21, 2012)..................................27

(iii)

*Trapani v. Greatwide Logistics Svcs., LLC,*
No. 10-334, 2011 WL 3803789 (E.D.Pa. Aug. 29, 2011) ......................................................23

*University of Tex. Southwestern Medical Center v. Nassar,*
570 U.S. 338 (2013)......................................................................................................20, 27

*Vandergrift v. City of Phila.,*
228 F. Supp. 3d 464 (E.D. Pa. 2017) .................................................................................20

*Walsh v. Wal Mart Stores, Inc.,*
200 Fed.Appx. 134 (3d Cir. 2006).....................................................................................33

### STATUTES, RULES & REGULATIONS

42 U.S.C Section 1981 ..........................................................................................................1

42 U.S.C. §2000 ....................................................................................................................1

Age Discrimination in Employment Act, 29 U.S.C. § 631, *et seq.* .....................................1, 19, 20

Title VII of the Civil Rights Act of 1964 ................................................................1, 20, 30, 31

Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq.*................................................1

Philadelphia Fair Practices Ordinance ........................................................................1, 20, 30, 31

PHRA ...............................................................................................................20, 30, 31

Title VII .....................................................................................................19, 20, 21, 29, 30, 41

Uniformed Services Employment and Reemployment Rights Act ...........................................21

### OTHER AUTHORITIES

First Amendment ..............................................................................................................16, 21

SL1 1683120v1 110202.00004

## I. PROCEDURAL HISTORY AND INTRODUCTION

Defendants, United Lutheran Seminary ("ULS"), Dr. Richard Green ("Dr. Green") and Bishop James Dunlop ("Bishop Dunlop") (collectively, "Defendants"), submit this Brief in Support of their Motion for Summary Judgment on all counts of the Complaint of Plaintiffs, Reverend Christina Johnsten ("Reverend Johnsten") and Dennis Trotter (Mr. Trotter").

Count I asserts retaliation, including a retaliatory hostile work environment, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 ("Title VII") by both Plaintiffs against all Defendants. Count II asserts the same claims under 42 U.S.C Section 1981 ("Section 1981"). Count III asserts those claims under the Age Discrimination in Employment Act, 29 U.S.C. § 631, *et seq*. ("ADEA"). Count IV asserts those claims under the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq*. ("PHRA"). Count V asserts the same claims under the Philadelphia Fair Practices Ordinance, Phila. Code Chapter 9-1100 ("PFPO").

## II. FACTS

### A. Plaintiffs Are Hired by ULS's Predecessor Seminaries and Placed In Newly-Created Positions After The Seminaries Were Consolidated.

The Lutheran Theological Seminary of Philadelphia ("LTSP") was founded in 1864. The Lutheran Theological Seminary at Gettysburg ("LTSG") was founded in 1826 and was the oldest continuing Lutheran seminary in the United States prior to the consolidation of LTSP and LTSP. In or around August of 2015, LTSP hired Mr. Trotter as Vice President of Advancement. (SUMF at ¶ 1). In or around August of 2015 LTSP hired Reverend Johnsten[1] as Vice President for Student Vocation and Formation. (SUMF at ¶ 2).

On or about July 1, 2017, LTSP and LTSG consolidated to form the Defendant ULS while maintaining separate campuses in Gettysburg and Philadelphia. (SUMF at ¶ 6). Upon

---

[1] Mr. Trotter and Reverend Johnsten are husband and wife.

1

consolidation, Mr. Trotter was initially given the title of Senior Vice President of Advancement, and Angela Zimmann assumed Mr. Trotter's former role as Vice President of Advancement. (SUMF at ¶ 7).

On November 1, 2017, as part of a reorganization of senior staff, ULS's new President, Dr. Theresa Latini, created a new Chief Operating Officer ("COO") position and promoted Mr. Trotter to the position. (SUMF at ¶¶ 8-9).  Also as part of the reorganization, in October of 2017 Dr. Latini created the position of Vice President of Student Services and Enrollment and promoted Reverend Johnsten to the position.  (SUMF at ¶¶ 10-11).

Reverend Johnsten, who graduated from Wartburg Theological Seminary in 2003 with a degree in Clinical Pastoral Education, became an ordained Lutheran minister in 2005. (SUMF at ¶¶ 3-4).  As Vice President of Student Services and Enrollment, Reverend Johnsten's duties included leading the student ordination process, student spiritual formation, overseeing chaplain and student care offerings, helping ministry candidates engage in vocational discernment[2], providing students with "opportunities for spiritual growth and formation," and working with bishops, synodical staff, and church staff.  (SUMF at ¶ 12).  Students referred to Reverend Johnsten as "Pastor Trina," and she considered herself a member of the clergy.  (SUMF at ¶ 14). As an ordained minister, Reverend Johnsten reported to the seminary president and bishops with the Evangelical Lutheran Church in America.  (SUMF at ¶ 15).

---

[2] According to the Evangelical Lutheran Church in America, "vocational discernment" means "considering what God has given you" and matching those abilities with the "needs of needs of your community" to determine "the part you've been given to play in this story of God's love for the world." Evangelical Lutheran Church in America, *Discerning Your Vocation*, https://www.elca.org/Our-Work/Leadership/Vocation-Become-a-Leader/Discerning-Your-Vocation (last visited March 24, 2021).

2

**B. The Board of Trustees Selects Bishop Dunlop as Acting President.**

In early 2018 members of the ULS community discovered that Dr. Latini had failed to disclose her previous involvement with a controversial organization, leading some to call for her resignation. (SUMF at ¶ 17).  ULS's Board of Trustees (the "Board,"), to which the president reports, invited members of the community to provide thoughts on the situation while it determined how to proceed.  (SUMF at ¶ 18).

Pursuant to that invitation, members of the Advancement staff, who were based primarily on the Gettysburg campus and reported to Vice President of Advancement Angela Zimmann, drafted a letter addressed to "ULS board members, faculty, fellow colleagues, and students," in which they suggested that Dr. Latini and others should resign.  (SUMF at ¶ 20).  The employees shared the draft letter with the only full-time Advancement staff member in Philadelphia and invited her to add her name to the letter.  (SUMF at ¶ 21).

On March 11, 2018, Mr. Trotter complained to the Chair of ULS's Board that the Advancement staff had not shared the letter with a part-time employee who was over 40 and African American, and with an independent contractor who was African American.  (SUMF at ¶ 22).  Although Mr. Trotter "inferred" that the staff's not sharing the letter with those individuals could be for race or age-related reasons, he admits he had no reason to believe that was the case. (SUMF at ¶ 23).

On March 6, 2018 members of ULS's senior administrative staff, known as the "President's Council," met with the Board to discuss the situation involving Dr. Latini.  During the meeting Mr. Trotter lost his temper and called the situation a "shit storm," stated that he was "tired of this shit," and warned the Board that they "needed to get [their] shit together."  (SUMF at ¶ 24). During a subsequent Board meeting on March 14, 2018, the Board removed Dr. Latini

and named Bishop James Dunlop Acting President of the seminary while the Board searched for someone to fill the role permanently.  (SUMF at ¶ 26).

When he became Acting President, Bishop Dunlop requested to meet individually with each member of the President's Council.  (SUMF at ¶ 28).  Bishop Dunlop and Mr. Trotter's introductory meeting was on March 16, 2018.  (SUMF at ¶ 29).  During the meeting Mr. Trotter requested that he be excused from assisting Ms. Zimmann. Although Mr. Trotter had no formal advancement-related responsibilities, he sometimes assisted Ms. Zimmann with her role as Vice President of Advancement because he had previously held the position.  (SUMF at ¶¶ 30, 50).

During the meeting Mr. Trotter also informed Bishop Dunlop that students of color had previously complained about certain issues involving systemic racism on campus.  Mr. Trotter described his reason for informing Bishop Dunlop of those complaints as follows:

> I simply wanted the incoming president to be aware of those things. . . . I simply wanted him to be aware that he was stepping into a hypercharged situation and that there were great concerns among students of color about action that needed to be taken.

(SUMF at ¶ 32). Mr. Trotter also mentioned the Gettysburg advancement team's decision not to share their draft letter with the part-time employee and independent contractor in Philadelphia. (SUMF at ¶ 30).

Mr. Trotter also informed Bishop Dunlop that two of Mr. Trotter's subordinates might file discrimination complaints.  (SUMF at ¶ 30).  He explained that he had advised the employees of the process to formally lodge complaints, adding: "So as my position of COO, I had advised people of process, but I was not aware that there had been any formal complaints filed, but I wanted [Bishop Dunlop] to be aware that this was a possibility."  (SUMF at ¶ 33). Trotter further testified:

> So what I tried to hit on were kind of the governance issues and some of the racial issues that were on campus, but we do not

> discuss each of them in any kind of detail. . . . And I simply
> wanted [Bishop Dunlop] to be aware that there was a ground swell
> which included the filing of charges against a faculty member.
> And what I was really trying to do was help him understand he was
> stepping into a racially charged arena and that he needed to be
> aware of that.  I did not provide any coaching or advice regarding
> that, I simply wanted him to be aware of it.

(SUMF at ¶ 34).

Mr. Trotter described his intention at the meeting as follows: "Since it was my first time
to meet with an incoming president, I had basically produced a briefing document so I could, as
efficiently as possible, bring him up to speed in terms of what was happening within my area of
administrative leadership." (SUMF at ¶ 31).  A subsequent letter from Mr. Trotter's attorney
confirmed that the purpose of the March 16th meeting was "to discuss the status of operations
under Mr. Trotter's oversight" and that Mr. Trotter shared information concerning race
complaints by those he supervised because: "As Chief Operating Officer, Mr. Trotter is obligated
to broadly share information with the President to ensure transparency and appropriate action."
(SUMF at ¶ 35).

Mr. Trotter was confrontational during the meeting. (SUMF at ¶ 36).  He stated that he
could not trust Bishop Dunlop and criticized Bishop Dunlop for not studying Mr. Trotter's
resume before the meeting.  (SUMF at ¶ 36).  Bishop Dunlop shared that he and others had
found Mr. Trotter's "outburst" during the March 6th Board meeting "unprofessional, [indicative
of] poor judgment and offensive."  (SUMF at ¶ 37).  Mr. Trotter acknowledged that his conduct
was inappropriate and, in a subsequent email, wrote: "In the future, I will not use words that
some Board members may find offensive and I will offer a public apology if necessary."  (SUMF
at ¶ 38).  In notes made after the March 16th meeting, Bishop Dunlop observed:

> In the entire conversation [Mr. Trotter] was combative and
> negative.  He was highly critical of me and other people.  It was
> one of the most negative and difficult conversations of my

5

> professional careers. [sic]  It was shocking to me that this was the first conversation I had with a person who now reported to me.  I know he is undergoing a difficult personal situation with his son being on trial but it did not in mind [sic] excuse the unprofessional nature of the conversation.

(SUMF at ¶ 40).

On March 13, 2018, Mr. Trotter emailed Ms. Zimmann and stated: "I don't believe that based on what's happened the past couple of weeks that I can be an effective mentor to you or leader for the Gettysburg Advancement staff."  (SUMF at ¶ 25).  He recommended that she work with an outside consultant if she needed assistance.  (SUMF at ¶ 25).  In late March of 2018, Ms. Zimmann submitted a formal complaint regarding what she perceived to be Mr. Trotter's hostile conduct toward her.  (SUMF at ¶ 46).  Among other things, Ms. Zimmann complained that Mr. Trotter laughed and drew public attention to her physical struggles resulting from a medical condition, and that he made threatening and inappropriate comments to her.  (SUMF at ¶ 46).  In a subsequent email Mr. Trotter referenced Ms. Zimmann's complaint, recommended that ULS investigate it, and stated that he did not wish to work with Ms. Zimmann or her team until her complaint was addressed. (SUMF at ¶ 39).  ULS hired an outside Human Resources consultant, Lyons Companies to investigate Ms. Zimmann's complaint.  (SUMF at ¶ 47).  After investigating, on April 9, 2018 Lyons Companies issued a report concluding that, although his conduct did not rise to the level of actionable discrimination or a hostile work environment, it was indicative of "poor judgment" and a "leadership style [that] may not be congruent with the institution's current philosophy . . ."  (SUMF at ¶ 48).

In response to Mr. Trotter's requests and Ms. Zimmann's complaint, Bishop Dunlop

emailed Mr. Trotter on March 27, 2018 and confirmed that he was excused from assisting Ms.

Zimmann, stating:

> I know that you have said to me that you do not want to be in a
> leadership role with Angela [Zimmann] because of your
> discomfort with her comments.  This is her team and she needs to
> handle the situation.  My hope is for me to just hear their concerns
> and mend the fences that we can move forward as a single
> advancement team."

(SUMF at ¶ 51).  He lost no pay when he was excused from those duties.  (SUMF at ¶ 52).

On April 24, 2018, Mr. Trotter complained to Bishop Dunlop that Ms. Zimmann had not

invited her subordinates from the Philadelphia campus to participate in an interview of a

candidate for the advancement team.  (SUMF at ¶ 53).  Mr. Trotter believed it was unfair to have

representation from only one campus at the interview.  (SUMF at ¶ 55).  During an April 25,

2018 President's Council meeting attended by Bishop Dunlop and members of the President's

Council, Mr. Trotter again complained about Ms. Zimmann's decision and, when Bishop Dunlop

indicated that he approved of her decision, Mr. Trotter accused him of being "oblivious or

incompetent" and questioned his fitness to lead the seminary.  (SUMF at ¶ 54).  Mr. Trotter's

colleagues later told him that his "oblivious or incompetent" comment had crossed the line, and

Mr. Trotter apologized to Bishop Dunlop. (SUMF at ¶ 58).

On May 11, 2018, Bishop Dunlop sent Mr. Trotter a letter addressing ongoing issues

involving Mr. Trotter's professionalism.  Among the items he raised were Mr. Trotter's outbursts

during the March 6th Board meeting, his "hostile and confrontational" conduct during their

initial meeting on March 16th, and Mr. Trotter's disrespectful statements during the April 25th

President's Council meeting. (SUMF at ¶ 61).  Bishop Dunlop added:

> I have continued to be patient with your inappropriate and
> unprofessional outbursts and behavior, however, you fail to take

7

> any responsibility for your own actions and continue to act in a
> hostile, disrespectful manner particularly in public settings to
> undermine my position and authority . . . While I had previously
> addressed your inappropriate conduct, no disciplinary action was
> taken against you. However, your repeated inappropriate conduct
> which includes outbursts of anger, insubordination, and your
> confrontational demeanor is not acceptable and cannot continue.  It
> is apparent that your current conduct demonstrates poor judgment,
> is hostile, insubordinate and disruptive and not congruent with this
> organization's philosophy.

(SUMF at ¶ 61).  The letter indicated that further such conduct would result in discipline up to
and including termination.  (SUMF at ¶ 62).

### C.  Plaintiffs' Attorney Submits Grievance Letters On Their Behalf.

In early April, Mr. Trotter's attorney delivered a letter to ULS stating, in pertinent part:

> Immediately after Mr. Dunlop's appointment as acting President,
> Mr. Trotter met with him on March 16, 2018 to discuss the status
> of the operations under Mr. Trotter's oversight.  As Chief
> Operating Officer, Mr. Trotter is obligated to broadly share
> information with the President to ensure transparency and
> appropriate action.  During that meeting, Mr. Trotter reviewed in
> great detail his concerns and those of the ULS staff regarding age
> and race-based discrimination.

(SUMF at ¶ 65).  The letter went on to complain that the excusal of Mr. Trotter from assisting
Ms. Zimmann was retaliation because Mr. Trotter had shared information with Bishop Dunlop
during the March 16th introductory meeting.  (SUMF at ¶ 66).

Shortly thereafter, the same attorney sent a letter to ULS on behalf of Reverend Johnsten
alleging that a Board member had made derogatory comments about Mr. Trotter during a Board
meeting in retaliation for Reverend Johnsten's having objected in 2017 to taking certain actions
relating to admissions and financial aid that she believed might violate education regulations, and
because she had "championed" the rights of African American students.  (SUMF at ¶ 67).

To ensure the complaints were thoroughly and objectively investigated, ULS hired an
outside Human Resources consulting firm, CCI Consulting ("CCI"), to investigate.  (SUMF at ¶

64).  After reviewing documents and interviewing witnesses, CCI concluded that Plaintiffs'
complaints were unsubstantiated, though others' complaints were substantiated. (SUMF at ¶ 70).

### D.  The Board Selects Dr. Green as Interim President While Their Search for a Permanent President Continues.

Before Bishop Dunlop's tenure as Acting President ended, the Board hired a search firm
to find candidates for his replacement.  (SUMF at ¶ 72). The Board interviewed candidates and
ultimately chose Dr. Richard Green, who is African American. (SUMF at ¶ 72).  Dr. Green
became Interim President on June 1, 2018.  (SUMF at ¶ 73).  This was Dr. Green's first
association with the seminary, and he knew no one at the seminary before he was considered for
the role.  (SUMF at ¶ 75).  After he began, Dr. Green met with his direct reports to learn "what
they thought were some of the strengths and weaknesses of the institution." (SUMF at ¶ 76).

As part of this process Dr. Green met with Mr. Trotter on June 13, 2018.  (SUMF at ¶
77).  During the meeting Mr. Trotter raised issues relating to "strategic planning" and, in
particular, strategic needs "in the areas of budget, staffing, analysis, assessment, organizational
decision-making and a shared culture and vision."  (SUMF at ¶ 77).  Mr. Trotter described the
meeting as follows:

> That meeting was basically to introduce myself, again, to welcome
> him to the institution, to begin the process of getting to know one
> another, and to lay out for him the areas that were my
> responsibility.  And so I had a rather comprehensive list like the
> one that I had provided to Bishop Dunlop that we went over.

(SUMF at ¶ 78).  Among the issues Mr. Trotter and Dr. Green discussed was a "[n]eed for
Human Resource expertise," and Mr. Trotter mentioned to Dr. Green that students did not feel
their claims of racism had been resolved.  (SUMF at ¶ 79).

Dr. Green met with Reverend Johnsten on July 3, 2018.  (SUMF at ¶ 81). During their
initial meeting Reverend Johnsten mentioned issues within her areas of responsibility as Vice

President of Student Services and Enrollment.  (SUMF at ¶ 82). This included the status of

complaints by students and the fact that no communications had been disseminated to the

seminary regarding the outcome of the CCI investigations.  (SUMF at ¶ 83). Reverend Johnsten

described her communications to Dr. Green regarding that issue as follows:

> We were just pressing that we've got to put out some public
> statements.  We have to admit, CCI has found that we have
> systemic racism, and some found some individuals, including
> Bishop Dunlop, had engaged in racist activities.  We need to be up-
> front about that and put that out. . . .
>
> I can tell you that in my first meeting with him . . . I list at the end,
> you know: Are you aware of these ongoing, these things that have
> been happening?

(SUMF at ¶ 83).

Mr. Trotter, Dr. Green and then-Chief Financial Officer ("CFO") Scott Ganley, who was

also in charge of Human Resources, met on August 29, 2018 to discuss performance issues

involving one of Mr. Trotter's direct reports.  (SUMF at ¶¶ 86-88).  When Dr. Green disagreed

with Mr. Trotter's suggestion as to what level of discipline was appropriate, Mr. Trotter accused

Dr. Green of "not having [Trotter's] back," to which Dr. Green exclaimed: "What the fuck?"

(SUMF at ¶ 89).  Mr. Trotter testified: "I found the expletive] offensive and unprofessional both

that he used it and that it was hypocritical for him to talk to me about my language when I never

exhibited that behavior, for him to suddenly drop the F bomb on me."  (SUMF at ¶ 91).

### E.  ULS Takes Measures to Avoid Bankruptcy Including a Staff Reorganization.

Beginning after the consolidation in 2017 and continuing through 2018, ULS experienced

financial difficulties. (SUMF at ¶ 96).  In mid-July of 2018, Mr. Ganley, the CFO, began

preparing a three-year projected budget.  (SUMF at ¶ 97). Mr. Ganley first shared a draft of his

budget with members of the President's Council on August 31, 2018.  (SUMF at ¶ 98).  In his

email attaching the draft budget Mr. Ganley warned members of the President's Council that,

due to the financial situation, they should be prepared to "sacrifice some resources for the common good."  (SUMF at ¶ 99).

During ULS Board meetings on September 25 and September 26 of 2018, Mr. Ganley presented a financial report in which he revealed the truly dire nature of the seminary's finances. The report stated, in pertinent part:

> I have included the unaudited income statement and balance sheet for ULS for the period July 1, 2017 to June 30, 2018 . . . There are still account reconciliations that need to be completed and I anticipate our auditors having numerous journal entries that could change the numbers.  The operational net loss for the fiscal year ended June 30, 2018 totaled $2.8m.  This is up from the numbers reported at the May board meeting due to a low estimate on the salary costs and higher maintenance costs than estimated.

(SUMF at ¶ 100).  The report disclosed that a seminary endowment was "underwater" by approximately $5 million, which Mr. Ganley later disclosed was because he had used endowment money to pay the seminary's operational expenses.  (SUMF at ¶ 101).  The report disclosed that certain entities affiliated with ULS had run out of cash and the seminary was obligated to pay those entities' bills, adding an additional $1 million to the seminary's projected costs.  (SUMF at ¶ 102).  The report discussed "cash flow" problems, including that the seminary's $3 million line of credit was fully drawn upon and there was a need for an additional, temporary $1 million line of credit "to help ease cash flow until the land sale goes through in January."  (SUMF at ¶ 103).  The report concluded: "The projected three year budget . . . of which only fiscal year ended June 30, 2019 is being voted on at this [Board] meeting shows the evolution of ULS to a break-even (or close to it) by the third year."  (SUMF at ¶ 106).

The "land sale" in Mr. Ganley's report referred to an anticipated sale of a Civil War battlefield on ULS's Gettysburg campus to American Battlefield Trust ("ABT"), a non-profit entity that buys and preserves historic battlefields.  (SUMF at ¶ 104).  Mr. Ganley's financial

report indicated that the land sale was expected to yield $3.5 million upon closing in early 2019, and "[t]he proceeds of this sale will be used to pay down as much of the lines of credit as possible, which will help to save significant interest expense as well as provide time for us to live into a more balanced budget going forward." (SUMF at ¶ 105). As Mr. Ganley testified, the intent was for ULS to "break even" after three years, and the budget contained no cushion for unforeseen expenses or revenue losses. (SUMF at ¶ 107). During the September 2018 meetings the Board voted to approve the projected budget for fiscal year 2018-2019 only. (SUMF at ¶).

With regard to the anticipated land sale, ABT's approach was to enter into sale agreements and, thereafter, fundraise from donors to cover the purchase price. Consistent with that approach, the sale agreement ULS and ABT executed in January of 2018 was contingent upon ABT's ability to raise funds to close the transaction. (SUMF at ¶ 118). ABT's fundraising efforts occurred throughout 2018. (SUMF at ¶ 119). Unfortunately, by September and October it became clear that ABT would not have the funds to cover the purchase price by the scheduled closing. (SUMF at ¶ 120). Mr. Ganley informed Dr. Green of the uncertainty regarding ABT's ability to raise funds. (SUMF at ¶ 122). Because ULS's ability to cover operating expenses under the proposed budget was dependent upon the anticipated proceeds of the transaction, ULS had to find a way to cover those expenses. (SUMF at ¶ 121).

As Board Chair Reverend Peter Boehringer, explained: "[B]etween the end of September and the beginning of October, we started to get fuller financial information. And realized that we were in much deeper water financially than we thought we were in." (SUMF at ¶ 124). By then, ULS had a cash deficit of about $1.5 million dollars. (SUMF at ¶ 125). The seminary also was at risk of defaulting on a $6.2 million loan, and it was in forbearance on another loan of more than $9 million dollars on which it was unable to make payments. (SUMF at ¶ 125).

In an effort to avoid financial ruin, the Board created a Financial Task Force, it began exploring the sale of real estate on both campuses, and it tasked Dr. Green with "appropriately sizing both faculty and staff to be economically feasible going forward." (SUMF at ¶¶ 110, 126). In accordance with that directive, Dr. Green determined that it was necessary to reorganize administrative staff. (SUMF at ¶ 127). Dr. Green discussed his reorganization plans with Reverend Boehringer and the Board's Executive Committee, who supported the decision. (SUMF at ¶¶ 128-129).

Dr. Green reviewed the seminary's payroll and determined that, rather than cutting numerous lower-level positions, it made sense to eliminate fewer highly-paid positions in the President's Council whose work could be performed by others. (SUMF at ¶ 132). More specifically, he determined that ULS could revert to the organizational structure that had existed until the prior year, which did not involve the COO or VP of Student Services positions Dr. Latini had created. (SUMF at ¶ 132). A goal of the reorganization was "the consolidation of duties where we can so that we can leverage talent against the needs of the organization." (SUMF at ¶ 133). As with other eliminated positions, Mr. Trotter's and Reverend Johnsten's responsibilities were absorbed by existing, lower paid staff. (SUMF at ¶ 134). Reverend Boehringer testified that it made sense to eliminate Plaintiffs' positions because they were costly and there were others who could do the work. (SUMF at ¶ 129). Indeed, Mr. Trotter's position was among the highest paid at the seminary. (SUMF at ¶ 130).

Dr. Green met separately with Mr. Trotter and Reverend Johnsten on October 8, 2018 to inform them of the elimination of their positions, and their employment ended that day. (SUMF at ¶ 135). Both Plaintiffs were offered a severance but did not accept because they believed they should be paid more than the amount that was offered. (SUMF at ¶ 137).

In total, nine positions were eliminated as part of the reorganization.  (SUMF at ¶ 138).

Mr. Trotter concedes that "[O]ne of the roles oftentimes of an acting or interim appointment is to

make changes in terms of structure, often the elimination of positions."  (SUMF at ¶ 139).  The

elimination and consolidation of positions was just one part of ULS's efforts to avoid financial

ruin.  In addition, ULS renegotiated loans, eliminated certain employee benefits, sold vehicles in

the seminary fleet, and sold campus real estate in addition to the Gettysburg battlefield.  (SUMF

at ¶ 140).  As a result of the cuts Dr. Green implemented, ULS has saved more than $1 million

per year in payroll costs alone. (SUMF at ¶ 141).

### F.  ULS Withdraws Job Postings It Could Not Afford Because Of Its Financial Distress.

During her tenure, Reverend Johnsten had been seeking to hire for the vacant position of

Director of Student Services, which would have reported to her.  (SUMF at ¶ 144).  Around the

time Reverend Johnsten's employment ended in October of 2018, an interview committee she

had selected to find candidates was in the process of negotiating an offer to a candidate for the

Director of Student Services position.  (SUMF at ¶ 145).  After an offer had been made, on

December 24, 2018 Reverend Johnsten emailed ULS's new Director of Human Resources, Ed

Henry, and applied for the position.  (SUMF at ¶ 146).  Because an offer had already been made

to the other candidate, Mr. Henry did not review Reverend Johnsten's application materials or

share them with anyone at ULS. (SUMF at ¶ 148).

Sometime thereafter, the candidate declined the job offer.  (SUMF at ¶¶ 145, 148).  At

that point, the seminary decided not to hire for any positions because of the financial distress it

was facing. (SUMF at ¶ 148). Accordingly, ULS withdrew the posting for the Director of

Student Services position and ultimately did not hire anyone for the position.  (SUMF at ¶ 149).

Dr. Green was not involved in posting the Director of Student Services position or deciding on

SL1 1683120v1 110202.00004

candidates to interview, and he was not aware Reverend Johnsten had applied for the position. (SUMF at ¶¶ 150, 158).

On January 10, 2019, Reverend Johnsten emailed Mr. Henry to apply for a Director of Admissions position that ULS had posted for internal applicants only.  (SUMF at ¶ 152).  The position was posted for internal applicants only because the seminary could not afford to hire outside the institution.  (SUMF at ¶ 154).  In accordance with the ongoing reorganization, the goal was to promote an internal employee who would move into the Director of Admissions position, and that employee's former position would be eliminated in order to further reduce headcount.  (SUMF at ¶ 155).  Because the Director of Admissions position was posted for internal applicants only, Mr. Henry did not review Reverend Johnsten's application materials or share them with anyone at the seminary.  (SUMF at ¶ 156).  Dr. Green was not involved in posting the Director of Admissions position or deciding on candidates to interview, and he was not aware Reverend Johnsten had applied for the position.  (SUMF at ¶¶ 153, 158). The seminary ultimately did not hire anyone for the Director of Admissions position.  (SUMF at ¶ 151).

## III.  ARGUMENT[3]

### A.  The Court Should Dismiss Reverend Johnsten's Claims Because They Are Barred Under The Ministerial Exception.

The "ministerial exception" bars the application of antidiscrimination lawsuits to employment relationships involving "those holding certain important positions with churches and other religious institutions."  *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).  This is because "a church's independence on matters of 'faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without

---

[3] Defendants presume the Court is familiar with the well-established standards for granting summary judgment and, therefore, omit them from this brief.

interference by secular authorities." *Id.* The Third Circuit has explained that "the ministerial exception precludes, under the Free Exercise Clause [of the First Amendment], judicial action or application of state or federal law limiting a religious organization's choice of spiritual messenger." *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 120 (3d Cir. 2018) (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 306, 310 (3d Cir. 2006)). As this Court recognized, the Supreme Court has "closed the door on the issue of whether tangible employment discrimination claims are within the scope of the ministerial exception," and "courts are bound to stay out of employment disputes involving ministerial employees." *Koenke v. Saint Joseph's Univ.*, No. 19-4731, 2021 WL 75778, at *3 (E.D. Pa. Jan. 8, 2021) (internal alteration omitted) (quoting *Morrissey-Berru*, 140 S. Ct. at 2055, 2060).

There is no "rigid formula" to determine whether the ministerial exception applies. *Hosanna-Tabor Evangelical Lutheran Church School v. EEOC*, 565 U.S. 171, 190 (2012). Courts must consider all relevant circumstances on a position-by-position basis. *Morrissey-Berru*, 140 S. Ct. at 2067. Despite its name, the exception is not limited to ordained religious officials with titles like "minister." *Id. Morrissey-Berru*, 140 S. Ct. at 2063-64. The ministerial exception applies to claims made by lay and ordained religious leaders alike because "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064. Nor is the exception limited to practicing members of the religion in question. *Id.* at 2068-69 (declining to consider whether a teacher was no longer "a practicing Catholic," which would require "excessive judicial entanglement in religious issues."). An employer's requirements for a position may be relevant to the inquiry to the extent they show whether the employer regards the position "as having an important responsibility in elucidating or teaching the tenets of the faith." *Id.* at 2064.

Here, Reverend Johnsten easily qualifies under the ministerial exception.  Reverend

Johnsten graduated from Wartburg Theological Seminary with a degree in Clinical Pastoral

Education, and she became an ordained Lutheran minister in 2005. (SUMF at ¶¶ 3-4).  She held

herself out as a "Reverend" since her ordination 16 years ago, and while working at ULS she

considered herself a member of the "clergy."  (SUMF at ¶¶ 4, 15).  Before joining ULS'

predecessor seminary, Reverend Johnsten was a minister at a Lutheran nursing home, where her

primary responsibilities were holding weekly worship and Bible study sessions with the nursing

home residents.  (SUMF at ¶¶1-2, 5).  Since leaving ULS, Reverend Johnsten has been the

presiding minister at several Lutheran churches in Montana. (SUMF at ¶ 143).

With Reverend Johnsten's theological credentials in mind, former ULS President Dr.

Latini promoted Johnsten to the position of Vice President of Student Services and Enrollment in

October 2017, a brand new position that was tailor-made to Reverend Johnsten's ecclesiastical

background and skillset.  (SUMF at ¶¶ 11-13).  As Vice President of Student Services and

Enrollment, Reverend Johnsten had formal religious responsibilities such as facilitating the

ordination process, providing chaplain and student care offerings, helping ministry candidates

engage in vocational discernment, and working with bishops, synodical staff, Lutheran Campus

Ministry Staff, and Lutheran Outdoor Ministry staff.  (SUMF at ¶ 12).  Reverend Johnsten also

had informal religious duties such as "pastoral care," overseeing health and wholeness and "self-

care education" for seminary students, "aiding in student spiritual formation," and "creating

opportunities for spiritual growth and formation." (SUMF at ¶ 12).

Consistent with these responsibilities, one of the preferred requirements for Reverend

Johnsten's position was experience in "parish ministry."  (SUMF at ¶13).  As an ordained

Lutheran minister and member of the clergy, during her ULS employment Reverend Johnsten

17

reported to the regional bishop for the Evangelical Lutheran Church in America ("ELCA"), in addition to the seminary president.  (SUMF at ¶15).  She attended a Lutheran ministry conference on behalf of ULS, and seminary students referred to her as "Pastor Trina."  (SUMF at ¶¶16, 18).  This evidence establishes that there are no material factual issues of fact with respect to this issue, and the ministerial exception prohibits this Court from considering these claims.

The Supreme Court's decision in *Morrissey-Berru* is instructive.  There, the Court held that the ministerial exception barred employment discrimination claims by two lay Catholic school teachers.  The teachers had secular educational credentials, were not ordained, and had little formal religious training.  *Id*. at 2056-57, 2066.  Nevertheless, in their jobs as elementary school teachers they participated in "religious duties" such as modeling and promoting Catholic faith and morals for their students.  *Id.* at 2056-57.  They "were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith." Id. at 2066.  The teachers prayed with students, attended Mass with them, and prepared the children for their participation in other religious activities."  *Id*.

In holding that the teachers' discrimination claims against the school were barred by the ministerial exception, the Court observed that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."  *Id*. at 2064 (citing *Hosanna-Tabor*).  It also recognized that the school's expectation that the teachers play a role in the spiritual guidance of students was important because, "[i]n a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition."  *Id*.

18

Here, the facts present an even more compelling case for application of the ministerial exception than in *Morrissey-Berru*.  Unlike the "lay teachers" in that case, Reverend Johnsten is an ordained minister and considered herself a member of the "clergy" while at ULS.  Reverend Johnsten had far more substantial religious duties than the teachers in *Morrissey-Berru*. ULS' preference that the Vice President of Student Services and Enrollment have prior experience in "parish ministry" demonstrates that it regarded the position "as having an important responsibility in elucidating or teaching the tenets of the faith." *Morrissey-Berru*, 140 S. Ct. at 2064.  Thus, Reverend Johnsten's claims are precisely the type that invite "judicial action or application of state or federal law . . . limiting a religious organization's choice of spiritual messenger."  *Lee*, 903 F.3d at 120.  Thus, the claims are barred under the ministerial exception and.the Court should grant summary judgment for Defendants on Reverend Johnsten's claims.

### B.  The Court Should Grant Summary Judgment for Bishop Dunlop and Dr. Green On Counts I and III Because Title VII and the ADEA Do Not Provide For Individual Liability.

It is well-established that individuals may not be held liable under Title VII or the ADEA. *See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) ("Congress did not intend to hold individual employees liable under Title VII."); *Hill v. Borough of Kutztown*, 455 F.3d 225, 246 n. 29 (3d Cir.2006) (noting that "the ADEA does not provide for individual liability"); *N'Jai v. Floyd*, 386 Fed.Appx. 141, 144 (3d Cir. 2010) ("The Wilkinsburg Individuals cannot be held liable under Title VII . . . or the ADEA.").  Therefore, Bishop Dunlop and Dr. Green are entitled to summary judgment on Counts I and III.

## C.  The Court Should Grant Summary Judgment For Defendants On the Remainder of Plaintiffs' Retaliation Claims.[4]

To survive summary judgment on a retaliation claim[5] "an employee must prove that (1) []he engaged in a protected employment activity, (2) [his] employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a causal link exists between the adverse action and the protected activity."  *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir.2007) (internal marks omitted).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action."  *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir. 1997).  The plaintiff must then show that the legitimate reason advanced by his employer is pretext for retaliatory animus.  *Id.*  "[R]etaliation claims must be proved according to traditional principles of but-for causation[.]" *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 339 (2013). In other words, the plaintiff must show "by a preponderance of the evidence that there is a 'but-for' causal connection" between the adverse employment action and retaliatory animus. *Miller v. CIGNA Corp.*, 47 F.3d 586, 586, 595–96 (3d Cir. 1995) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701 (1993).

---

[4] The Complaint makes no distinction with regard to retaliation claims arising during Acting Bishop Dunlop's 10-week tenure and those arising during Interim President Dr. Green's four-month tenure prior to Plaintiffs' termination.  There was no overlap in their respective tenures.  It is axiomatic that Bishop Dunlop may not be held liable for events occurring after his departure, just as Dr. Green may not be held liable for events that occurred before he was hired.  Accordingly, Defendants shall address separately the allegations involving Bishop Dunlop and those involving Dr. Green, except with regard to the hostile work environment claims, which are appropriately addressed together under a "totality of the circumstances" analysis.

[5] Section1981, Title VII, ADEA, PHRA, and the PFPO claims are analyzed under the same framework "except where there is something specifically different in [their] language requiring that [they] be treated differently." *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (internal citations omitted).  *See id*. at 327 (Title VII and the PHRA). *See also Vandergrift v. City of Phila.*, 228 F. Supp. 3d 464, 486 n.206 (E.D. Pa. 2017) (same under the PFPO); *McGuckin v. Brandywine Realty Trust*, 185 F. Supp. 3d 600, 610 (E.D. Pa. 2016) (same under the ADEA); *Fullard v. Argus Research Labs., Inc*., No. CIV.A. 00–509, 2001 WL 632932, at *1 (E.D. Pa. June 6, 2001) (internal citations omitted) (same under §1981).

SL1 1683120v1 110202.00004

1. **Bishop Dunlop did not retaliate against Mr. Trotter. [6]**

Mr. Trotter's alleged protected activities during Bishop Dunlop's tenure consist of: (1) the issues he raised during their introductory meeting on March 16, 2018 and in his follow-up email the next day; (Complaint at ¶¶ 43-45); (2) letters Mr. Trotter's attorney sent to ULS dated April 4, 2018 and May 16, 2018 alleging retaliation and "race and age-based discriminatory practices at ULS" (Complaint at ¶¶ 53, 54, 75); and (3) Mr. Trotter's May 7, 2018 and May 21, 2018 interviews with the outside consulting firm ULS hired to investigate the complaints his attorney raised (Complaint at ¶ 69).

(a) **Mr. Trotter may not rely upon the March 16th meeting and follow-up email to establish a prima facie case because he did not engage in "protected activity."**

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court held that, in a retaliation claim, complaints made within the scope of an employee's job are not "protected activity." *Id.* at 421-24. While *Garcetti* involved First amendment retaliation claims by a public employee:

> "[its] broader holding has since been expanded to stand for the more general proposition that in cases where it is a third party who is attempting to help the alleged victim of discrimination assert her rights, 'protected activity' is limited to activity that is adverse to the company, or outside the employee's normal employment role; this would include the filing of a complaint, but not reporting suspected discrimination to a supervisor."

*Atkinson v. Lafayette College*, 653 F. Supp. 2d 581, 596-97 (E.D. Pa. 2009) (internal quotation and alteration omitted) (collecting cases). Thus, "[n]umerous courts dealing with retaliation claims under the Fair Labor Standards Act[,] Title VII, the Uniformed Services Employment and Reemployment Rights Act, and other statutes – all of which apply the same prima facie case elements . . . have held that in order to engage in statutorily protected activity the employee must

---

[6] While the Complaint is ambiguous as to whether Reverend Johnsten asserts retaliation claims against Bishop Dunlop, she admitted during her deposition that Bishop Dunlop did not retaliate against her. *See* SUMF at ¶46.

'**step outside his or her role of representing the company** . . ." *Id*. at 598 (quotation omitted)

(emphasis added).  This Court explained the basis for the rule as follows:

> [A] part of any management position often is acting as an
> intermediary between the manager's subordinates and the
> manager's own superiors. The role necessarily involves being
> mindful of the needs and concerns of both sides and appropriately
> expressing them. Voicing each side's concerns is not only not
> adverse to the company's interests, it is exactly what the company
> expects of a manager.
>
> If we did not require an employee to "step outside the role" or
> otherwise make clear to the employer that the employee was taking
> a position adverse to the employer, nearly every activity in the
> normal course of a manager's job would potentially be protected
> activity . . . . An otherwise typical at-will employment relationship
> could quickly degrade into a litigation minefield, with whole
> groups of employees—management employees, human resources
> employees, and legal employees, to name a few—being difficult to
> discharge without fear of a lawsuit. For those reasons, we agree
> that an employee must do something outside of his or her job role
> in order to signal to the employer that he or she is engaging [in]
> protected activity . . .

*Id*. at 597 (quoting *Hagan v. Echostar Satellite*, L.L.C., 529 F.3d 617, 628 (5th Cir.2008).

Here, the evidence establishes that, when Mr. Trotter raised issues to Bishop Dunlop

during the March 16th meeting and in his follow-up email, he was acting squarely within the

scope of with his role as COO.  Mr. Trotter testified: "Since it was my first time to meet with an

incoming president, I had basically produced a briefing document so I could, as efficiently as

possible, ***bring him up to speed in terms of what was happening within my area of***

***administrative leadership***." (SUMF at ¶ 31) (emphasis added).  He testified that he informed

Bishop Dunlop of student complaints because he "simply wanted the incoming president to be

aware of those things. . . . I simply wanted him to be aware that he was stepping into a

hypercharged situation and that there were great concerns among students of color about action

that needed to be taken." (SUMF at ¶ 32).  With regard to potential complaints by employees,

Mr. Trotter testified: "So as my position of COO, I had advised people of process, but I was not aware that there had been any formal complaints filed, but I wanted [Bishop Dunlop] to be aware that this was a possibility."  (SUMF at ¶ 33).  He added:

> I simply wanted [Bishop Dunlop] to be aware that there was a ground swell which included the filing of charges against a faculty member.  And what I was really trying to do was help him understand he was stepping into a racially charged arena and that he needed to be aware of that.  I did not provide any coaching or advice regarding that, I simply wanted him to be aware of it.

(SUMF at ¶ 34).  In addition to this testimony, Mr. Trotter's attorney confirmed in his April 4, 2018 letter to ULS that Mr. Trotter met with Bishop Dunlop on March 16th "***to discuss the status of operations under Mr. Trotter's oversight***," and that Mr. Trotter had shared information about race complaints because, "***[a]s Chief Operating Officer, Mr. Trotter is obligated to broadly share information with the President to ensure transparency and appropriate action***." (SUMF at ¶ 35) (emphasis added).

These admissions by Mr. Trotter and his attorney leave no doubt that, in reporting issues to Bishop Dunlop on March 16th and 17th, Mr. Trotter was acting on behalf of the seminary as COO and he was not "stepping outside" his role to take a position adverse to ULS.  Therefore, under *Garcetti* and its progeny, Mr. Trotter did not engage in protected activity on March 16th and March 17th.  *See, e.g.*, *Trapani v. Greatwide Logistics Svcs., LLC*, No. 10-334, 2011 WL 3803789, at *12 (E.D.Pa. Aug. 29, 2011) ("The Court is also not persuaded that the plaintiff engaged in protected activity by protecting the rights of other employees. . . The Court finds these facts to be consistent with the plaintiff's role as VP of Organizational Development, which encompassed the supervision of company human resource functions . . ."); *Bradford v. UPMC*, 2008 WL 191706, at *4 (W.D.Pa. Jan. 18, 2008) ("Plaintiff's . . . reports about EEO

investigations [] do[] not constitute 'protected activity.' Courts have held that an employee must "step outside" her normal role in order to be considered as opposing unlawful activity.").

The only remaining alleged protected activity during Bishop Dunlop's tenure were his attorney's April 4, 2018 and May 16, 2018 letters and his interviews with a Human Resources consulting firm investigating the issues raised in those letters. As explained below, Mr. Trotter cannot establish a retaliation claim based on those activities.

> **(b) Mr. Trotter cannot establish a prima facie case because he suffered no adverse employment action "because of" any protected activity.**

An "adverse employment action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 126 S.Ct. 2405 (2006) (internal citations and quotation marks omitted). The only actions of Bishop Dunlop that can even arguably be considered "adverse employment actions" under this standard are: (1) the excusal of Mr. Trotter from assisting Ms. Zimmann[7]; and (2) Bishop Dunlop's May 11, 2018 letter to Mr. Trotter. As explained below, Mr. Trotter has not established a viable retaliation claim with regard to either action.

> > i. *Bishop Dunlop's excusal of Mr. Trotter from assisting Ms. Zimman was not an "adverse employment action" and did not occur "because of" protected activity.*

Ms. Zimmann was officially the head of the advancement team. Mr. Trotter held no formal advancement-related duties during the time in question, though he sometimes assisted Ms. Zimmann because he had previously held her position. (SUMF at ¶¶ 49-50) On March 13, 2018, Mr. Trotter emailed Ms. Zimmann and stated: "I don't believe that based on what's happened the past couple of weeks that I can be an effective mentor to you or leader for the Gettysburg Advancement staff," and he recommended that she use an outside consultant is she

---

[7] Mr. Trotter refers to this as the "removal" of his "advancement duties."

needed assistance.  (SUMF at ¶ 25).  He then formally requested from Bishop Dunlop that he be

excused from working with Ms. Zimmann and her advancement team.  (SUMF at ¶ 39).  Less

than two weeks later, Bishop Dunlop responded to Mr. Trotter in an email and stated:

> I know that you have said to me that you do not want to be in a
> leadership role with Angela [Zimmann] because of your
> discomfort with her comments.  This is her team and she needs to
> handle the situation.  My hope is for me to just hear their concerns
> and mend the fences so that we can move forward as a single
> advancement team."

(SUMF at ¶ 51).  It is nonsensical for Mr. Trotter to argue that, by granting Mr. Trotter's request

to be excused from performing extra duties beyond those associated with his COO role, Bishop

Dunlop engaged in retaliatory conduct.  Bishop Dunlop's decision did not result in a loss of pay,

and it was entirely consistent with the organizational chart, pursuant to which Ms. Zimmann was

in charge of Advancement.  (SUMF at ¶ 49).  Mr. Trotter admitted as much in his deposition,

when he testified he believes Bishop Dunlop made the decision in reliance on the organizational

chart and because he was unaware Mr. Trotter had previously held Ms. Zimmann's position.

(SUMF at ¶¶ 56-57).  Because the excusal from assisting Ms. Zimmann was a reasonable

response to Mr. Trotter's request and Ms. Zimmann's complaint about Mr. Trotter's

inappropriate conduct, Mr. Trotter cannot show that it would dissuade a reasonable person in Mr.

Trotter's position from engaging protected activity.

Further, even if it were a legally cognizable "adverse employment action," Mr. Trotter

still has not established a prima facie case because he cannot show causation.  As explained

above, the March 16th meeting and follow-up email were not protected activity.  The only

protected activity during Bishop Dunlop's tenure – the letters from Mr. Trotter's attorney's and

the subsequent Human Resources interviews – occurred *after* Mr. Trotter was excused from

assisting Ms. Zimmann. *See, e.g.*, *Jackson v. Temple Univ. Hosp.*, 501 Fed.Appx. 120, 123 (3d

Cir. 2012) (noting that plaintiff's protected activity occurred after decision to terminate the

plaintiff was made, and thus "she cannot establish a causal connection between the termination

of her employment and her [protected activity].").

Even if he could establish a prima facie case, Defendants have a legitimate, non-

retaliatory reason for the excusal – Mr. Trotter's request to be excused and Ms. Zimmann's

complaints about Mr. Trotter.  Mr. Trotter cannot show that those undisputed reasons are a

pretext for retaliation, which is fatal to this claim.

> ii. *Bishop Dunlop's May 11, 2018 letter was not an "adverse employment action" and did not occur "because of" protected activity.*

Bishop Dunlop's May 11th letter was a legitimate response to Mr. Trotter's

unprofessional and inappropriate conduct.  That conduct is undisputed: First, Mr. Trotter lost his

temper during the March 6th Board meeting, calling it a "shit storm" and stating that he was

"tired of this shit" and that the Board "needed to get [their] shit together."  (SUMF at ¶ 24). Mr.

Trotter acknowledged in writing that he was prepared to apologize to the Board for that conduct.

(SUMF at ¶ 38). Second, during his introductory meeting with Bishop Dunlop, Mr. Trotter was

so unprofessional that Bishop Dunlop, who had just met Mr. Trotter for the first time, prepared a

note stating:

> In the entire conversation he was combative and negative.  He was
> highly critical of me and other people.  It was one of the most
> negative and difficult conversations of my professional careers.
> [sic]  It was shocking to me that this was the first conversation I
> had with a person who now reported to me.  I know he is
> undergoing a difficult personal situation with his son being on trial
> but it did not in mind [sic] excuse the unprofessional nature of the
> conversation.

(SUMF at ¶ 40).  Mr. Trotter does not dispute the facts surrounding that meeting. Third, Mr.

Trotter lost his temper during the April 25, 2018 President's Council meeting, accusing Bishop

Dunlop of being "oblivious or incompetent," and questioning his fitness to lead the seminary.

26

(SUMF at ¶ 54).  Mr. Trotter apologized to Bishop Dunlop after his colleagues pointed out the inappropriate nature of his conduct.  (SUMF at ¶ 58).

Based on all of this undisputed conduct, it was entirely appropriate for Bishop Dunlop to send the May 11th letter to Mr. Trotter admonishing him to conduct himself in a more professional manner.  The letter imposed no discipline and there is no evidence that Bishop Dunlop shared it with anyone other than Mr. Trotter.  As such, and because it had no connection to any protected activity, Bishop Dunlop's May 11th letter would not dissuade a reasonable worker from making or supporting a charge of discrimination and was not an "adverse employment action."  *See, e.g.*, *Hightower v. Easton Area School Dist.*, 818 F.Supp.2d 860, 886 (E.D.Pa. 2011) (holding that written discipline including admonition about plaintiff's "communication" was not an "adverse employment action supporting a retaliation claim because "no reasonable jury could find that [they] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (citation omitted); *Spangler v. City of Philadelphia*, No. 10–3434, 2012 WL 1835599, at *9 (E.D.Pa. May 21, 2012) (holding that supervisor's reprimand of plaintiff was a "response to perceived insubordination and mistakes," and thus "would not have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (citing *White*, 548 U.S. at 68).

Even if the letter were an "adverse employment action," there is no evidence establishing the required causal link between the letters from Mr. Trotter's attorney[8] and Bishop Dunlop's May 11th letter – let alone evidence that his attorney's letters were the "but-for" cause of Bishop

---

[8] Although Mr. Trotter was interviewed by the outside firm ULS hired to investigate his and other complaints during that time period, there is no evidence in the record that Bishop Dunlop was aware of that interview prior to preparing the May 11th letter.  *See Pochopin v. Johnson Controls, Inc.*, 764 Fed.Appx. 142, 146 (3d Cir. 2019) (affirming summary judgment for employer and holding: "Pochopin has no evidence showing, or even suggesting, that Babikan was aware of those [protected] actions.").

Dunlop's letter.  *See Nassar*, 570 U.S. at 339.  Further, because Mr. Trotter's inappropriate conduct that was the subject of the letter is undisputed, Defendants have a legitimate, non-retaliatory reason for the May 11th letter.  Plaintiffs can point to no evidence of pretext.

For all of these reasons, the Court should grant summary judgment for Defendants on the claims arising during Bishop Dunlop's tenure.

> ### 2.  **Dr. Green did not retaliate against Plaintiffs when he included their positions in a reorganization.**

Plaintiffs allege that Dr. Green retaliated against them when he eliminated their positions as part of the reorganization conducted in response to the seminary's financial position.  The alleged protected activity upon which these claims are based are: (1) The April and May 2018 letters from Plaintiffs' attorney and Plaintiffs' subsequent CCI interviews; and (2) Plaintiffs' introductory meetings with Dr. Green in June of 2018.

As explained below, the claims fail because Plaintiffs cannot establish a prima facie case, and because Plaintiffs cannot show that the legitimate, non-retaliatory reason for the elimination of their positions was a pretext for retaliation.

> ### (a)  **Plaintiffs Cannot Establish a Prima Facie Case.**

Plaintiffs cannot establish a prima facie case of retaliation with regard to the termination of their employment because most of the alleged activities that are the basis for the claim are not in fact "protected activity," and because there is no evidence to establish "but-for" causation.

> ### i.  *Plaintiffs did not engage in protected activity during introductory meetings with Dr. Green because they were acting within the scope of their job duties.*

Plaintiffs' introductory meetings with Dr. Green were not protected activity for the same reasons Mr. Trotter's March 2018 introductory meeting with Bishop Dunlop was not protected activity: Plaintiffs were acting on behalf of the seminary when they brought issues to Dr. Green's

attention during the meetings and they did not "step outside" their roles to take a position adverse

to ULS.  Plaintiffs attended the meetings at Dr. Green's request so that he could learn about

"strengths and weaknesses of the institution." (SUMF at ¶ 76).  As Mr. Trotter testified:

> That meeting was basically to introduce myself, again, to welcome
> him to the institution, to begin the process of getting to know one
> another, and to lay out for him the areas that were my
> responsibility.  And so I had a rather comprehensive list like the
> one that I had provided to Bishop Dunlop that we went over.

(SUMF at ¶ 78).

Likewise, Reverend Johnsten explained that during her meeting with Dr. Green she

mentioned student complaints in order to ensure that proper messaging went out to the campus

community, testifying:

> We were just pressing that we've got to put out some public
> statements.  We have to admit, CCI has found that we have
> systemic racism, and some found some individuals, including
> Bishop Dunlop, had engaged in racist activities.  We need to be up-
> front about that and put that out. . . .
>
> I can tell you that in my first meeting with him . . . I list at the end,
> you know: Are you aware of these ongoing, these things that have
> been happening?

(SUMF at ¶ 83).  Thus, because Plaintiffs were acting within the scope of their job duties when

they mentioned issues to Dr. Green during their introductory meetings, they did not engage in

protected activity.

> ii.  *Reverend Johnsten did not engage in protected activity during her meeting*
> *with Dr. Green because she did not oppose an unlawful employment*
> *practice.*

As the Third Circuit has held, in order for a statement to be "protected activity"

supporting a retaliation claim, "it must be possible to discern from the context of the statement

that the employee opposes an unlawful *employment* practice." *Curay-Cramer v. Ursuline*

*Academy of Wilmington, Delaware, Inc*., 450 F.3d 130, 135 (3d Cir. 2006) (quotation omitted)

SL1 1683120v1 110202.00004

(emphasis added). *See also Nelson v. Upsala College*, 51 F.3d 383, 388 (3d Cir.1995) ("Our holding is consistent with the language of section 704 [of Title VII] as that section interdicts 'an unlawful employment practice' rather than conduct in general which the ... employee finds objectionable. The words 'employment practice' suggest that the retaliatory conduct must relate to an employment relationship.").

During her meeting with Dr. Green, Reverend Johnsten referenced only complaints by *students*, not employees.  As such, under *Curay-Cramer* and *Nelson*, she did not engage in protected activity.  This case is comparable to *Lamb–Bowman v. Delaware State University*, 152 F.Supp.2d 553 (D.Del. 2001), which the Third Circuit cited with approval in *Curay-Cramer*.  In *Lamb-Bowman*, a college basketball coach opposed what she believed to be the school's practice of providing disparate funding to male and female sports teams.  *Id*. at 560.  The District Court held that such opposition was not protected activity under Title VII because the plaintiff "did not oppose . . . an unlawful employment practice . . ." *Id*. at 560.  It held: "[P]laintiff did not oppose actions by defendants that allegedly violated Title VII. Rather, plaintiff opposed disparities between the women's and men's athletic programs at DSU—an activity that is protected by Title IX." *Id*.  The court concluded: "Advocacy of students' rights is simply not prohibited by Title VII."  *Id*. at 561, n. 17.  The Third Circuit affirmed the decision on appeal. 39 F. Appx 748, 751 (3d Cir. 2002) ("[W[e conclude that the District Court properly awarded summary judgement to DSU because such an adverse employment action [sic] would be potentially protected under Title IX and not Title VII."). *See also Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1183-84 (8th Cir. 1998) (finding a plaintiff's internal complaints to school officials about alleged racial discrimination against students is not a protected activity under Title VII).

Similar to the plaintiff's activity on behalf of students in *Lamb-Bowman*, Reverend

Johnsten's elevation of student complaints does not implicate Section1981, Title VII, ADEA,

PHRA, or the PFPO.  Therefore, she did not engage in protected activity.

> *iii.  Reverend Johnsten did not engage in protected activity when her attorney
> sent a letter to ULS and participated in the CCI interviews.*

To constitute protected activity, an employee must hold an "objectively reasonable,"

"good faith" belief that the activity he or she opposes is unlawful under the pertinent

employment discrimination statute. *Clark County v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508,

(2001) (per curiam) (rejecting retaliation claim where "[n]o reasonable person could have

believed that" the underlying incident complained about "violated Title VII's standard" for

unlawful discrimination); *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1085 (3d

Cir.1996) (retaliation plaintiff must "act[ ] under a good faith, reasonable belief that a violation

existed").

Here, the April 13, 2018 letter from Reverend Johnsten's attorney did not oppose any

practice made unlawful under Section1981, Title VII, ADEA, PHRA or the PFPO.  The letter

alleged that Reverend Johnsten suffered retaliation: (1) because she had objected to taking

actions relating to admissions and financial aid; and (2) because she "championed" the rights of

African American students.  (SUMF at ¶ 67).  Regarding the first alleged protected activity, the

statutes at issue in this lawsuit do not protect employees who assert objections to admissions and

financial aid practices unrelated to a protected characteristic.[9]  This is, at most, a general

complaint of unfair treatment, which is not protected activity.  *See Barber v. CSX Distribution

Services*, 68 F.3d 694, 702 (3d Cir. 1995) ("A general complaint of unfair treatment does not

translate into a charge of illegal . . . discrimination.").

---

[9] There is no contention that the admissions and financial aid issues involved any protected classes.

SL1 1683120v1 110202.00004

The second alleged protected activity – "championing the rights of African American students" – was not "protected activity" for the reasons explained above in Section B.2(a)(ii), *i.e.*, it was not opposition to an unlawful *employment* practice.  Thus, Reverend Johnsten did not have a reasonable, good-faith belief that her attorney's letter opposed an unlawful employment practice under the pertinent statutes.  As such, the letter and subsequent CCI interview were not protected activity and cannot be used to support Reverend Johnsten's retaliation claims.

>    iv.  *Plaintiffs also cannot establish a prima facie case because there is insufficient evidence of causation.*

Even if all of Plaintiffs' alleged protected activity was legally cognizable, Plaintiffs still could not establish a prima facie case with regard to the termination of their employment because there is no causal link between the events.  To the extent Plaintiffs rely on temporal proximity, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 n. 9 (3d Cir. 2003) (quotations omitted).  The Third Circuit has held that "a temporal proximity of two days is unusually suggestive of causation, but . . . a temporal proximity of greater than ten days requires supplementary evidence of retaliatory motive."  *Blakney v. City of Phila.*, 559 Fed.Appx. 183, 186 (3d Cir. 2014) (citations omitted).  *See also Williams*, 380 F.3d at 760 (finding that a span of two months was not indicative of a causal link); *Moore v. Shinseki*, 487 Fed.Appx. 697, 698 (3d Cir. 2012) ("Two months is not so close to be unduly suggestive of causation.").

Here, Plaintiffs' employment was terminated more than five months after their attorney submitted grievance letters to ULS and Plaintiffs were interviewed by CCI.  This is far longer than the period of time the Third Circuit requires to establish causation.  Dr. Green – who implemented the reorganization that resulted in the elimination of Plaintiffs' positions – was not

32

yet affiliated with the seminary when that alleged protected activity occurred.[10]  Likewise,

Plaintiffs' employment was terminated approximately four months after their introductory

meetings with Dr. Green.  This, too, is too attenuated a time period to establish causation.

The record is devoid of "other evidence" of retaliatory motive by Dr. Green.  The Third

Circuit has held that "such 'other evidence' might include a 'pattern of antagonism' subjecting

plaintiff to a 'constant barrage of written and verbal warnings and disciplinary actions. . ."

*Blakney*, 559 Fed.Appx. at 16.  Here, from Dr. Green's first day on June 1st until Plaintiffs'

employment ended on October 8th, the <u>only</u> alleged "antagonism" involving Dr. Green was his

use of a single expletive during a meeting with Mr. Trotter and another employee on August 29,

2018.  No reasonable juror could conclude that Dr. Green's use of that expletive in August is

evidence that Plaintiffs' alleged protected activity in June and earlier was the "but-for" cause of

their termination in October. *See Nassar*, 570 U.S. at 339.  Indeed, Mr. Trotter concedes that he

does not believe Dr. Green's use of the expletive was retaliatory.  (SUMF at ¶¶ 91-92).  Context

is important as well: Dr. Green used the expletive during a private meeting in response to an

accusation from Mr. Trotter that Dr. Green "did not have [Trotter's] back" in reference to a

personnel issue they were discussing.  (SUMF at ¶).  *See Daniels v. Sch. Dist. Of Phila.*, 776

F.3d 181, 196 (3d Cir. 2015) (holding that "context matters" when determining whether an

action is retaliatory and "an act that would be immaterial in some situations is material in

others.")  (*quoting Burlington N.*, 548 U.S. at 69); *Walsh v. Wal Mart Stores, Inc.,* 200

Fed.Appx. 134 (3d Cir. 2006) ("Although the facts of this case present a tense employment

situation in which numerous reprimands and aggressive monitoring of Walsh may have been

---

[10] *See* Complaint at ¶ 80 ("Significantly, Interim President Green had not been previously associated with or employed by ULS [before he was hired].").

excessive, there is no evidence to suggest that these actions arose in response to Walsh's [protected activities].").

Because Plaintiffs cannot establish the first or second prongs of a retaliation claim in connection with the termination of their employment, Defendants are entitled to summary judgment on this claim.

> **(b)  Plaintiffs cannot sustain their burden to show that Defendants' legitimate, non-retaliatory reason for eliminating their positions is a pretext for retaliation.**

Even if Plaintiffs could establish a prima facie case, Defendants are entitled to summary judgment because they have presented a legitimate, non-retaliatory reason for the elimination of Plaintiffs' positions – the reorganization due to the seminary's desperate financial circumstances. Plaintiffs can point to no evidence from which a factfinder could conclude that this asserted reason is a pretext for unlawful retaliation.

It is undisputed that ULS faced increasingly dire financial circumstances in the weeks leading to Plaintiffs' termination. *See generally* SUMF at ¶¶ 96-125.  The seminary's CFO warned staff to prepare to "sacrifice some resources for the common good." (SUMF at ¶ 99).  At the Board meeting approximately two weeks before Plaintiffs' employment ended, Board members discovered ULS was facing an operational net loss of $2.8 million despite having exhausted its $3 million line of credit, and a seminary endowment was underwater by $5 million. (SUMF at ¶ 103).  ULS-affiliated entities had run out of cash and the seminary was obligated to pay those entities' expenses, despite not having cash to pay its own expenses.  (SUMF at ¶ 102). The projected budget the Board had approved was dependent on the anticipated $3.5 million in revenue from the ABT land sale transaction, and there was no cushion for unforeseen expenses or revenue losses.  At the same time, ULS learned that ABT had been unable to raise funds to

pay for the land sale, placing the seminary's ability to cover basic expenses such as payroll in jeopardy.

In response to these revelations ULS created a Financial Task Force.  (SUMF at ¶ ).  The Board began selling real estate and tasked Dr. Green with "appropriately sizing both faculty and staff to be economically feasible going forward."  (SUMF at ¶ 126).  Pursuant to this directive, Dr. Green reviewed the seminary's payroll and determined that the most efficient way to cut costs while impacting the fewest number of employees was to revert to the previous organizational structure, which did not include the COO or VP of Student Services positions. (SUMF at ¶ 132).

Thus, the reorganization and elimination of positions Dr. Green implemented were a reasonable and necessary response to dire financial circumstances that likely saved the seminary from bankruptcy and possible extinction.  Since the reorganization, ULS has saved more then $1 million per year in payroll costs alone.  Mr. Trotter concedes that it is often the role of an interim president such as Dr. Green to enact cost-saving measures, including the elimination of positions. (SUMF at ¶ 139) ("[O]ne of the roles oftentimes of an acting or interim appointment is to make changes in terms of structure, often the elimination of positions.").

It is well-settled that a financially-driven reorganization or reduction in force is a legitimate, non-retaliatory reason for an employee's termination.  *See Kelly v. Drexel University*, 907 F.Supp. 864, 875 (E.D.Pa. 1995) ("Economic necessity is a legitimate nondiscriminatory reason for employment decisions.") (citations omitted); *Davis v. Davis Auto, Inc.*, 509 Fed.Appx. 161, 163-64 (3d Cir. 2013) ("[D]eclining business and corresponding financial difficulties led [defendants] to decide to reduce personnel. . .  [D]efendants' cost reduction efforts (and the effect these had on personnel) are well-documented in the record.  Based on these facts, we do not

35

believe a reasonable juror could find that the defendants' decision to terminate Davis was motivated in whole or in part by her [protected conduct]").

Critically, courts will not second guess business-related financial decisions such as this. For example, in *Kelly v. Drexel University*, 94 F.3d 102 (3d Cir. 1996), the Third Circuit rejected the plaintiff's questions about the economic necessity for the elimination of her position. *Id*. at 109. The court held: "[I]t hardly would be appropriate for us to second guess that management decision." *Id*. It continued: "We are dealing, after all, with discrimination statutes which are not intended to handcuff the managers and owners of business to the *status quo*." *Id*. (internal quotation omitted). As such, the Third Circuit concluded that the decision to reorganize or reduce one's workforce "is a management decision with which a court should be loath to interfere." *Id*. *See also Kenney v. Footlocker Worldwide*, 55 Fed.Appx. 35, 37 (3d Cir. 2002) ("We will not second-guess a business entity's managerial determination that a reduction-in-force was an economic reality."); *Hennessey v. Dollar Bank, FSB*, 833 Fed.Appx. 961, 966 (3d Cir. 2020) ("[T]he courts do not sit as a super-personnel department that reexamines an entity's business decisions.") (internal quotations omitted).

Because Plaintiffs cannot establish a prima facie case and there is no evidence that Defendants' legitimate, non-retaliatory reason for the termination of Plaintiffs' employment is a pretext, Defendants are entitled to summary judgment on the retaliatory termination claims.

3. ***ULS did not retaliate against Reverend Johnsten when it did not hire her for the Director of Student Services or Director of Admissions Positions.***

Reverend Johnsten claims that ULS did not consider her application for the Director of Student Services position or her subsequent application for the Director of Admissions position in retaliation for her filing of a Charge with the Equal Employment Opportunity Commission ("EEOC") after her termination ended. As explained below, Defendants are entitled to summary

36

judgment on these claims because Reverend Johnsten cannot establish a prima facie case, and

because she cannot show that the reason the seminary did not consider her applications – the

withdrawal of the postings for financial reasons – was a pretext for retaliation.

      **(a)  Reverend Johnsten Cannot Establish a Prima Facie Case of Retaliatory Failure to Rehire.**

Reverend Johnsten cannot establish a causal link between her filing of an EEOC Charge

and the fact that she was not hired for the Director of Student Services and Director of

Admissions positions.  The undisputed evidence establishes that ULS's newly-hired Human

Resources Director, Ed Henry, did not review Reverend Johnsten's application for the Director

of Student Services position or share it with any anyone at the seminary. (SUMF at ¶ 148).  This

was because, at the time Reverend Johnsten applied, ULS had already offered the position to

another candidate.   (SUMF at ¶ 148).  After that candidate declined the offer, the seminary

withdrew the job posting due to the financial distress it was facing.  (SUMF at ¶¶ 148, 151).

Thus, neither Dr. Green – the alleged retaliator – nor the relevant hiring manager for the position

was aware that Reverend Johnsten had even applied for the Director of Student Services

position, negating any inference of causation.

The Director of Admissions position was posted for internal candidates only.   (SUMF at

¶ 154).  This was part of ULS' overall reorganization strategy: The seminary could not afford the

additional costs associated with hiring externally, so ULS decided to promote an internal

employee with the intention of eliminating the vacant position that remained in order to further

reduce headcount and save costs. (SUMF at ¶¶  154-155). Because the seminary was only

looking to promote internal candidates, Mr. Henry did not review Reverend Johnsten's

application or share it with anyone at the seminary.  (SUMF at ¶ 156).  Thus, again, Dr. Green

and the relevant hiring manager were unaware Reverend Johnsten had applied, negating any

inference of causation.  (SUMF at ¶¶ 153, 158).  Therefore, Reverend Johnsten has failed to establish a prima facie case.

> ### (b) There Is No Evidence That ULS's Legitimate, Non-Retaliatory Reason for Not Reviewing Reverend Johnsten's Applications Were a Pretext for Retaliation.

Even if Reverend Johnsten could establish a prima facie case, Defendants would still be entitled to summary judgment because there is no evidence that ULS's legitimate, non-retaliatory reason for not hiring her is a pretext.  Reverend Johnsten was not hired for either position because no one was hired for either position.  Because of the financial situation, to continue reducing employee headcount, ULS withdrew both job postings and did not hire anyone.  This undisputed fact is fatal to Reverend Johnsten's claim.  *See*, *e.g.*, *Lula v. Network Appliance*, 255 Fed.Appx. 610, 612 (3d Cir. 2007) (holding that no "legally cognizable claim exists . . . when a potential employee was not hired because the company 'deactivated' that position and did not fill it."); *Besko v. New Jersey Juvenile Justice Comm'n*, 558 Fed.Appx. 295, 298-99 (3d Cir. 2014) (affirming summary judgment for employer on discriminatory failure to promote claim because "the [employer] never hired anyone" for the position); *Chughtai v. Jeanes Hosp.*, No. 11-4173, 2012 WL 4459592, at *16 (E.D.Pa., Sept. 26, 2012) (granting summary judgment for defendant on failure to rehire claim because, among other things, "[t]he position was . . . cancelled, and no one was hired.").  Therefore, Defendants are entitled to summary judgment on Reverend Johnsten's claim of retaliatory failure to rehire.

### D. The Court Should Grant Summary Judgment For Defendants On Plaintiffs' Retaliatory Hostile Work Environment Claim.

The Third Circuit held in *Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006), that "our usual [discriminatory] hostile work environment framework applies equally" to claims of retaliatory hostile work environments. *Id*. at 449, a*brogated on other grounds by Burlington N. & Santa Fe*

Case 2:20-cv-00570-TR   Document 28-1   Filed 03/26/21   Page 45 of 49

*Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, (2006). That framework requires a plaintiff to prove that: "(1) he suffered intentional discrimination because of [retaliation]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir.2001).

1. ***Mr. Trotter did not experience an actionable hostile work environment.***

The allegations supporting Mr. Trotter's claim are that: (1) Bishop Dunlop excused him from assisting Ms. Zimmann with advancement-related duties on March 27, 2018; (2) Bishop Dunlop did not ask him to participate in the Board's interviews of candidates to succeed Bishop Dunlop; (3) Bishop Dunlop sent Mr. Trotter the May 11, 2018 letter regarding his unprofessional conduct; and (4) Dr. Green used an expletive during the August 29, 2018 meeting.

First, Mr. Trotter cannot show that these isolated incidents happened "*because of*" any protected conduct. The legitimate reasons for Mr. Trotter's excusal from assisting Ms. Zimmann and for Bishop Dunlop's May 11th letter are discussed at length *supra* in section B.2(b)(ii). Further, there is no indication that Dr. Green's use of an expletive in August was in any way related to alleged protected activity by Mr. Trotter months earlier.

As to Mr. Trotter's claim that he should have been asked to interview candidates for Bishop Dunlop's replacement (*i.e.*, his future boss), the undisputed evidence is that an outside search firm selected candidates whom the Board interviewed, and they ultimately selected Dr. Green. (SUMF at ¶ 72).[11] Mr. Trotter cannot explain why he believes he should have been permitted to participate in the Board's interview process. He did not request to be part of the process, and there is no evidence that <u>any</u> ULS employee was involved with the interview

---

[11] Given that he reported to the seminary president, it would have been out of the ordinary for him to have been involved with the process of interviewing his future superior.

SL1 1683120v1 110202.00004

process, including Bishop Dunlop.  Nor is there evidence that Bishop Dunlop even had the authority to invite Mr. Trotter to participate in the Board's interviews.

In this regard the case is similar to *Komis v. Sec. of Labor*, 918 F.3d 289 (3d Cir. 2009). In *Komis*, the Third Circuit affirmed the District Court's grant of judgment as a matter of law for the employer on a retaliatory hostile work environment claim.  *Id*. at 299.  It held that the conduct about which the plaintiff complained lacked a causal connection to the plaintiff's protected activity.  *Id*.  As an example, the court referenced a supervisor's denial of the plaintiff's request to work from home, noting that "no other employee in Komis's office was given permission to work remotely from home, [and] the decision not to give Komis such unique dispensation does not appear materially adverse or even objectionable."  *Id*.  Similarly, here, there is nothing objectionable about Mr. Trotter's not being involved in the Board's interview process, let alone evidence to connect it with protected activity.

Next, Mr. Trotter also cannot satisfy the second requirement for a hostile work environment because he cannot establish that the conduct about which he complains was "severe or pervasive."  In assessing whether conduct is severe or pervasive courts consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367.  "But in considering the totality of the circumstances, we filter out 'simple teasing, offhand comments, and isolated incidents.'" *Kokinchak v. Postmaster General of the United States*, 677 Fed.Appx. 764, 767 (3d Cir. 2017) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  "[O]ffhanded comments, and isolated incidents (unless extremely serious) cannot sustain a hostile work environment claim."  *Caver*,

420 F.3d at 262 (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, (1998)). In conducting this analysis, "it is important to separate significant from trivial harms because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Moore v. City of Philadelphia*, 461 F.3d 331, 346 (3d Cir.2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006)). Stated more succinctly: "Title VII does not create a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998 (1998).

Turning to Mr. Trotter's claim, four isolated incidents over the course of five months is not sufficiently frequent and does not satisfy the "pervasiveness" standard. *See, e.g.*, *Eng v. Scranton UC Service Center*, No. 3:CV-08-1213, 2009 WL 10718764, at *7 (M.D.Pa. July 22, 2009) (holding that "incidents [that] occurred once a month or less over a period of four or five months" were not pervasive); *Small v. KS Engineers PC*, No. 08–3458, 2010 WL 1705002, at *3 (D.N.J. Apr. 26, 2010) ("[O]ne incident with G.P. and several incidents over five to six months with Mr. Langevine cannot be reasonably considered . . . pervasive. . . ."); *Elizan v. Milton Hall Surgical Associates, Inc.*, No. 1:08-CV-2249, 2010 WL 11500752, at *10 (N.D.Ga. March 5, 2010) ("[N]one of these incidents, considered together and as a totality, can be said to be pervasive. The incidents were infrequent—four in five months—and none of them was severe.").

Regarding severity, no reasonable juror could conclude that any of these incidents, on their own or in their totality, was physically threatening or humiliating. Indeed, the only conduct that could even arguably meet this standard was Dr. Green's use of a single expletive during the August 29th meeting. However, that qualifies as an "offensive utterance," which the Third Circuit held cannot create an actionable hostile work environment. *Caver*, 420 F.3d at 262.

41

Finally, Mr. Trotter cannot show that the events about which he complains would have detrimentally affected a reasonable person in his position.  Again, there were reasonable and legitimate job-related reasons for the events occurring during Bishop Dunlop's tenure.  That leaves only Dr. Green's use of profanity on a single occasion.  No reasonable employee would be detrimentally affected by an employer's use of a single expletive.  Therefore, Mr. Trotter's hostile work environment claim cannot survive summary judgment.

> 2. ***Reverend Johnsten cannot show that she suffered an actionable hostile work environment.***

Reverend Johnsten's allegations in support of her hostile work environment claims are even sparser than those of Mr. Trotter.  Indeed, the Complaint contains no allegations that, if proven, would support such a claim.  Nor is there any such evidence in the record.  Rather, Reverend Johnsten's allegations and evidence focus on the termination of her employment and her subsequent applications for the Director of Student Services and Director of Admissions positions.

As such, the Court should grant summary judgment for Defendants on Plaintiffs' retaliatory hostile work environment claims.

SL1 1683120v1 110202.00004

## IV.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their

motion for summary judgment on each count of the Complaint.

Respectfully submitted,


DATED:  March 26, 2021             /s/ *Brad M. Kushner*
                                   Brad M. Kushner (PA ID No. 307429)
                                   bmk@stevenslee.com
                                   Stevens & Lee, P.C.
                                   1818 Market Street, 29th Floor
                                   Philadelphia, PA  19103
                                   Tele: (215) 751-1949
                                   Fax: (610) 371-7906

                                   *Attorneys for Defendants*

43