**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DENNIS TROTTER and | : | CIVIL ACTION |
| CHRISTINA JOHNSTEN, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED LUTHERAN | : | No. 20-570 |
| SEMINARY, et al., | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

**Timothy R. Rice**                                                    **July 29, 2021**
**U.S. Magistrate Judge**

Plaintiffs Dennis Trotter and Christina Johnsten, husband and wife, bring claims of

retaliation and hostile work environment against United Lutheran Seminary ("ULS") under Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 ("Title VII"), 42 U.S.C

Section 1981 ("Section 1981"), the Age Discrimination in Employment Act, 29 U.S.C. § 631, et

seq. ("ADEA"), the Pennsylvania Human Relations Act, 43 P.S. §§ 951, et seq. ("PHRA"), and

the Philadelphia Fair Practices Ordinance, Phila. Code Chapter 9-1100 ("PFPO").  Complaint

(doc. 1).  Trotter and Johnsten also claim retaliation and hostile work environment against James

Dunlop and Dr. Richard Green under Section 1981, PHRA, and PFPO.  Id.  The claims stem

from Trotter's and Johnsten's employment at ULS, their termination in October 2018, and ULS's

refusal to re-hire Johnsten.  Id.  ULS seeks summary judgment, arguing that Johnsten's claims

are subject to the ministerial exception, Title VII and ADEA claims against Dunlop and Green

are not actionable, and Trotter and Johnsten failed to plead <u>prima facie</u> claims of retaliation and

hostile work environment.  S.J. Mot. (doc. 28).

Because Johnsten did not serve ULS in a ministerial capacity, her claims are not barred by the ministerial exception.  Because Trotter's and Johnsten's claims against Dunlop and Green are actionable, and because they present sufficient evidence to create questions of material fact, I deny ULS's motion.

I.   Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence and any inferences from the evidence must be viewed in the light most favorable to the non-moving party.  See Ray v. Warren, 626 F.2d 170, 173 (3d Cir. 2010).  If reasonable minds could conclude that there are sufficient facts to support a plaintiff's claims, summary judgment should be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It should be granted if no "reasonable jury could return a verdict for the nonmoving party," based on the evidentiary record.  Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

II.  Facts Most Favorable to Trotter and Johnsten

In 2015, Trotter and Johnsten began working for ULS[1] as Vice President for Advancement and Vice President for Student Vocation and Formation, respectively.  S.J. Mot., Statement of Facts ¶¶ 1-2; Resp. to Statement of Facts (doc. 29-1) ¶¶ 1-2.  On November 1, 2017, Trotter began serving as Chief Operating Officer ("COO") of ULS.  Pl. Statement of Add'l. Facts (doc. 29-3) ¶¶ 10-11.  Around the same time, Johnsten started serving as Vice President of Student Services and Enrollment ("VPSSE").  SOF ¶ 10; Resp. to SOF ¶ 10.

---

[1]     Trotter and Johnsten worked for the Lutheran Theological Seminary at Philadelphia until 2017, when it became ULS after merging with the Lutheran Theological Seminary at Gettysburg. SOF ¶ 6; Resp. to SOF ¶ 6.

On March 14, 2018, James Dunlop became acting president of ULS.  SOF ¶ 26; Resp. to

SOF ¶ 26.  At their initial meeting on March 16, 2018, Trotter asked Dunlop to investigate his

complaints of a racist and ageist letter from the Advancement staff in Gettysburg and racism

within the ULS offices of Finance and Advancement.  PSOAF ¶¶ 27, 29.  He also complained

about Dunlop referencing the prior president's termination as a "lynching," and the exclusion of

African American and older members of the Philadelphia Advancement staff from the prior

president's evaluations.  Id. at ¶ 27, 31.  Trotter gave Dunlop a memorandum documenting racial

issues at ULS, including the letter from the Gettysburg Advancement staff, a formal complaint

against a faculty member, and informal complaints against the offices of Finance and

Advancement.  Id. at ¶ 33; 3/16/18 Trotter Briefing, B-175-79.  Trotter also advised Dunlop that

Angela Zimmann threatened him with a human resources complaint, and asked not to supervise

Zimmann.  3/16/18 Trotter Briefing at B-175; Trotter Dep. at 130:4-16, A-33.  On March 27,

2018, Dunlop reassigned Trotter's advancement responsibilities to Zimmann.  PSOAF at ¶¶ 127-

28.

On April 4, 2018, Trotter filed a grievance against ULS, claiming that: (1) he was

stripped of job responsibilities in retaliation for reporting concerns of racism to Dunlop; (2)

Dunlop described a meeting with African-American students with racially-charged language

when he said it was like "going back to Egypt to eat watermelon;" (3) Trotter's advancement-

related responsibilities were assigned to a younger employee; and (4) Dunlop retaliated against

Trotter for voicing concerns about accounting withdrawals from the Gettysburg Seminary

Endowment Foundation.  Id. at ¶¶ 41-46; 4/4/2018 Attorney Email, B-181-87.  Trotter also

alleges, around the same time, that he opposed Dunlop's refusal to investigate formal complaints

of racism raised by two ULS staffers.  PSOAF ¶¶ 47-48.

On April 6, 2018, Trotter cooperated in an EEO-related investigation regarding Zimmann's claims that Trotter had harassed her. Id. at ¶¶ 49-50. On April 9, 2018, the third-party investigator emailed Dunlop that "there is no evidence to support that Dennis Trotter has, or is currently, engaging in unlawful discrimination resulting in a hostile work environment." Id. at ¶ 51.

On April 13, 2018, Johnsten filed a grievance with ULS asserting it improperly directed her to: (1) admit students without regard to the Pennsylvania State Code's credit requirements; (2) distribute donor funds in a manner inconsistent with the donor's documented wishes; and (3) offer institutional gift aid without documenting the aid in the students' financial aid awards. Id. at ¶ 52; 4/13/2018 Attorney Email, B-205-11. She also complained that ULS retaliated against her for objecting to its directives. 4/13/2018 Attorney Email at B-208-11. On May 7, 15, and 21, 2018, Trotter and Johnsten met with an attorney from CCI Consulting, who ULS had retained to address Trotter's and Johnsten's April 2018 grievances. PSOAF ¶¶ 65-66, 75, 78.

On May 11, 2018, Dunlop wrote a letter to Trotter accusing him of poor work performance and threatening to fire him, citing events that pre-dated Dunlop's presidency. Id. at ¶¶ 69, 71. On May 16, 2018, Trotter supplemented his April 2018 grievance to include complaints about Dunlop's letter. Id. at ¶¶ 76-77.

On June 1, 2018, Dunlop stepped down and Dr. Richard Green became the interim president of ULS. Id. at ¶ 81. Dunlop retained his seat on the ULS Board of Trustees. Id. at ¶ 82. At about the same time, Dunlop gave Green a binder containing information about Trotter, including his May 11 letter. Id. at ¶ 134. On June 13, 2018, Trotter met Green and gave him a memorandum noting racism complaints at ULS. Id. at ¶¶ 84-85; 6/13/18 Memorandum, B-212-13.

In July 2018, CCI concluded its investigation of Trotter's and Johnsten's grievances, finding that Dunlop made racist statements and recommending "individual complainants should be met with one-on-one and advised as to the findings of their respective complaints, substantiated or not, as well as steps being taken going forward to address behaviors/concerns." PSOAF at ¶¶ 88-91, 96.

Before August 28, 2018, Trotter told Green that one ULS employee racially harassed a co-worker. Id. at ¶¶ 101-104. In an August 29, 2018 meeting, Trotter raised additional complaints about the employee's racism and disclosed that the targeted co-worker would file an EEO complaint unless ULS investigated. Id. at ¶¶ 105-06. Green responded: "Fuck, what the fuck." Id. at ¶ 108.

During September 5 and 12, 2018 President's Cabinet meetings, Trotter and Johnsten shared their concerns about racism at ULS, which Green dismissed. Id. at ¶¶ 109-12. During the September 2018 ULS Board of Trustees Meeting, Johnsten presented a report detailing accusations of racism at ULS and the progress of trauma specialists hired to discuss "issues of trauma, racism, microaggressions, and cultural competency" with ULS students and staff. Enrollment Services and Student Life Report, B-286-290. The Board of Trustees also passed its annual budget, which included Trotter's and Johnsten's salaries. PSOAF ¶ 146.

In an October 2, 2018 meeting, Green told Trotter he did not plan to fire the employee who was accused of racist conduct in August 2018. Trotter Dep. at 291:23-292:2, B-23. Green informed Trotter that his investigation had consisted of a discussion with board members, which Trotter argued was insufficient. Id. at 292:13. Green demanded that Trotter leave the meeting, and as a result, Trotter sought counseling. PSOAF ¶ 119.

On October 5, 2018, Green informed ULS's board chairman that he planned to fire Trotter and Johnsten. Id. at ¶ 165. Three days later, during an October 8 meeting, Green fired Trotter and Johnsten. PSOAF ¶ 125. Green testified he did not consider retaining either Trotter or Johnsten, deciding to fire them together. Green Dep. at 238:6-13, B-61. Following the terminations, ULS offered Trotter and Johnsten severance packages in exchange for a release of claims against ULS. PSOAF ¶ 223.

On November 7, 2018, Trotter and Johnsten filed retaliation complaints with the EEOC and PHRC. Id. at ¶ 246. On December 24, 2018, Johnsten applied for ULS's Director of Student Services position. Id. at ¶ 278. As of January 9, 2019, ULS's website still posted the vacant Director of Student Services position. Id. at ¶ 282. On January 10, 2019, Johnsten emailed ULS's Director of Human Resources to follow up on her application. Id. at ¶ 283. After receiving Johnsten's application, the Human Resources Director discussed the vacancy with Green, and ULS halted the search for a Student Services Director. Id. at ¶¶ 286-89. ULS never responded to Johnsten's application, in part because Johnsten had not yet agreed to her severance agreement. Id. at ¶ 291; Henry Dep. at 99:1-10, B-128.

On January 8, 2019, ULS posted a position for Director of Admissions with a designation for "internal applicants only." PSOAF at ¶ 298. On January 15, 2019, Johnsten applied for the position. Id. at ¶ 304. ULS never reviewed her application. Henry Dep. at 88:20-22, B-125.

On February 1, 2019, Trotter and Johnsten filed their second retaliation complaints against ULS with the EEOC and PHRC based on their termination and ULS's failure to re-hire Johnsten. PSOAF ¶ 321. On November 14, 2019, the EEOC issued Notices of Right to Sue to Trotter and Johnsten. Compl., Ex. 3, Notices. On February 3, 2020, Trotter and Johnsten filed their Complaint.

III. Discussion

    A.    Ministerial Exception

ULS argues I should dismiss Johnsten's claims pursuant to the ministerial exception.  I disagree.

The ministerial exception bars adjudicating employment disputes "involving those holding certain important positions with churches and other religious institutions."  Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2060 (2020).  Its purpose "is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,'—is the church's alone."  Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 194–95 (2012) (citations omitted).

Whether an employee is subject to the ministerial exception "rests not on [ ] ordination status or [ ] formal title, but rather on [ ] functional status as the type of employee that a church must be free to appoint or dismiss in order to exercise the religious liberty that the First Amendment guarantees."  Hosanna-Tabor, 565 U.S. at 206 (Alito, J. concurring).  Courts consider the ministerial exception on a position-by-position basis.  Morrissey-Beru, 140 S. Ct. at 2067.  "What matters, at bottom, is what an employee does," id.

Johnsten did not perform ministerial duties.  She "oversaw admissions, financial aid, student services, housing, student activities, the candidacy process, [and] the ordination process." Johnsten Dep. 25:19-26:5, A-82-83.  ULS's job description for her position states "the [VPSSE] has overall responsibility for providing leadership, management and supervision for the day-to-day operations of admissions, financial aid, student services (candidacy, spiritual formation, student life, Title IX, student government and other leadership programs, ALSAC-Lilly Grant,

student disciplinary issues, residential housing), chaplain/student care offerings, and responding

to student needs as they arise."  Job Description, B-162.  ULS categorized the VPSSE's essential

functions as admissions, financial aid, student services, and chaplain/student care.  Id. at B-163.

The chaplain/student care responsibilities included "supervis[ing] the work of the current

chaplain-for-transition, providing referrals and follow up for students, staff and faculty desiring

to make use of [the chaplain] resource," and "lead[ing] staff on the student care team, which

offers pastoral care, health and wholeness education, and self-care education for students."  Id.

Johnsten did not lead any prayer groups or other religious service at ULS.  PSOAF ¶ 19.  Also,

even Green acknowledged that Johnsten never taught religion to ULS students.  Green Dep.

38:23-39:6, B-37.  These facts support Johnsten's claim that her position was administrative in

nature.

ULS argues Johnsten had a ministerial role because she is an ordained minister, students

referred to her as "Pastor Trina," she attended a Lutheran ministry conference on ULS's behalf,

the job description listed parish ministry as a preferred experience, and she had religious

responsibilities and reported to a regional bishop.  S.J. Mot. at 17-18.

Johnsten's status as an ordained minister is not dispositive.  See Hosanna-Tabor, 565

U.S. at 193 (although relevant, an ordination does not automatically ensure ministerial exception

coverage).  The job description's preferred experience and students referring to Johnsten as

"Pastor Trina" also do not affect what Johnsten did at ULS, which is "what matters, at bottom."

Morrissey-Beru, 140 S. Ct. at 2067.

Nor did Johnsten's "religious responsibilities" constitute ministerial functions.  ULS

argues she had formal responsibilities such as facilitating the ordination process, providing

chaplain offerings, helping ministry candidates, and working with bishops, as well as informal

responsibilities such as leading staff in pastoral care.  S.J. Mot. at 17.  Yet, Johnsten only

oversaw those processes and provided referrals; she never performed ministerial duties herself.

Johnsten Dep. at 25:19-26:5, A-82-83.  Although Johnsten attended a Lutheran conference, id. at

139:2-4, A-125, ULS offers no evidence that suggests her attendance featured any ministerial

acts.  And her job description clarifies that she manages staff who perform such pastoral care

duties without performing them directly.  Job Description, B-163.  I deny summary judgment on

the ministerial exception theory.

      B.     Counts I and III Are Proper

ULS argues Dunlop and Green are entitled to summary judgment for Counts I and III

because there is no individual liability under Title VII and the ADEA.  S.J. Mot. at 19.  Because

Counts I and III were brought only against ULS, and not the individual defendants, I deny ULS's

request.  See Compl. ¶¶ 142-149, 158-165.

      C.     Retaliation Claims

ULS seeks summary judgment on Trotter's and Johnsten's retaliation claims, arguing

they never engaged in protected activity, and therefore, suffered no adverse employment action

because of protected activity.  S.J. Mot. at 21-34.  ULS also argues its financial circumstances

were a legitimate, non-pretextual reason for eliminating Trotter and Johnsten's positions, and

Trotter and Johnsten cannot sustain their burden to prove otherwise.  Id. at 34-38.  Viewing the

evidence in the light most favorable to the non-movants, I disagree.

To establish a prima facie case of retaliation, Trotter and Johnsten must show: (1) they

engaged in protected activity; (2) ULS took adverse employment action against them; and (3) a

causal connection existed between their protected activity and ULS's adverse action.  See Marra

v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).

If Trotter and Johnsten establish a <u>prima facie</u> case, the burden shifts to ULS to demonstrate a legitimate, non-retaliatory reason for the adverse employment action.  <u>Moore v. City of Phila.</u>, 461 F.3d 331, 342 (3d Cir. 2006).  The burden then shifts back to Trotter and Johnsten to show that ULS's explanation is false or pretextual and retaliation was the real reason for the adverse employment action.  <u>Id.</u>  Trotter and Johnsten must produce some evidence from which a jury could reasonably reach these conclusions for their claims to survive this summary judgment motion.  <u>Id.</u>

        1.      Trotter

ULS argues Trotter fails to set forth sufficient evidence from which a jury could find he met the first and third elements of a <u>prima facie</u> claim because he has not identified protected activity and cannot establish causation.

ULS argues Trotter's only potential protected activities are his: (1) March 16, 2018 introductory meeting with Dunlop and follow-up email; (2) April 4, 2018 and May 16, 2018 grievances, alleging retaliation and "race and age-based discriminatory practices at ULS"; (3) May 7 and 21, 2018 interviews with CCI Consulting regarding his grievances; and (4) July 2018 introductory meetings with Green.  S.J. Mot. at 21, 28.  Relying on the "manager rule," ULS argues Trotter's introductory meetings with Dunlop and Green are not protected activities.  S.J. Mot. at 21-22.

The manager rule requires that an employee "step outside his . . . role of representing the company" to engage in protected activity.  <u>McKenzie v. Renberg's Inc.</u>, 94 F.3d 1478, 1486 (10th Cir. 1996).  Its purpose is to avoid a "litigation minefield" of retaliation claims among employees whose responsibilities include "counselling and communicating complaints."  <u>DeMasters v. Carilion Clinic</u>, 796 F.3d 409, 421 (4th Cir. 2015) (JJ. Ambro, Krause, and Barry,

sitting by designation) (citations omitted).  The <u>DeMasters</u> Court, however, held that the manager rule "has no place in Title VII enforcement."  796 F.3d at 424.  Although the United States Court of Appeals for the Third Circuit has not addressed whether the manager rule applies in Title VII claims, several Third Circuit judges, sitting by designation, have rejected its applicability, and I will do so here.  <u>Id.</u> at 412.

Further, even if Trotter's above complaints were protected by the manager rule, Trotter also contends that he engaged in the following protected activities: (1) filing his April 4, 2018 grievance; (2) complaining about retaliatory conduct from Dunlop regarding Zimmann's harassment claim on May 4, 2018; (3) requesting ULS investigate Dunlop for retaliation on May 11, 2018; (4) raising concerns of racism among the ULS staff to Green on August 29, 2018; (5) raising concerns of racism among ULS staff during the President's Cabinet meeting on September 5 and 12, 2018; and (6) addressing Green's refusal to investigate claims of racist harassment among ULS staff and his removal of Trotter's oversight of the issue during an October 2, 2018 meeting.  Trotter Supp. Resp. to Interrogatories, B-532-37.  Viewed in the light most favorable to Trotter, a reasonable jury could conclude that he engaged in protected activities, satisfying the first step of a <u>prima facie</u> retaliation analysis against ULS.  <u>Curay Cramer v. Ursuline Acad. of Wilmington, Del., Inc.</u>, 450 F.3d 130, 135 (3d Cir. 2006) (holding Title VII's opposition clause can be triggered by "informal protests of discriminatory employment practices") (citations omitted).

ULS also argues that Trotter fails to show a causal connection between his alleged protected activity and his termination.  ULS fails to address all of Trotter's alleged protected activities.  According to ULS, the only protected activities that could serve as the basis for a retaliation claim are Trotter's attorney grievance letters and CCI interview, and those activities

did not cause Trotter's firing.  S.J. Mot. at 32.  Even if those actions were not causally related to

Trotter's termination, a reasonable jury could conclude that other protected activities, such as

Trotter's October 2, 2018 meeting with Green, were causally related to his termination.

During the October 2, 2018 meeting, Trotter alleges he challenged Green for not

investigating a claim of racial harassment among employees, to which Green "basically told

[him] to be silent" and threw him out of the room.  Trotter Dep. at 291:19-292:20, B-21.  Green

decided to fire Trotter three days later.  PSOAF ¶ 119.  The "unusually suggestive temporal

proximity between the protected activity and the alleged retaliatory action," Lauren W. ex. Rel.

Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007), supports an inference of causation,

Mammen v. Thomas Jefferson University, ---F. Supp. 3d----, 2021 WL 843604, at *8 (E.D. Pa.

Mar. 5, 2021), to satisfy the second and third requirements for a prima facie retaliation claim.

The burden therefore shifts to ULS "to advance a legitimate, non-retaliatory reason for its

adverse employment action."  Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir.

1997).  ULS claims that its financial difficulties constitute a legitimate reason for firing Trotter.

Through 2018, ULS alleges it faced financial hardships severe enough to raise concern whether

it could make payroll.  Carlson Dep., 48:8-14, 49:13-22, 50:2-5, A-315-17.  During a September

25-26, 2018 ULS board meeting, Chief Financial Officer Scott Ganley presented a financial

report establishing an operational net loss of $2.8 million during the 2018 fiscal year and that

endowment funds were paying the seminary's operational expenses.  Ganley Report, A-275-76;

Russell Dep. 110:5-17, A-292; 109:18-110:4, A-291-92; 117:15-24, A-296.  Ganley disclosed

that ULS was obligated to pay affiliated entities' bills totaling an additional $1 million.  Ganley

Dep. 54:20-55:8, A-261-62.  Ganley also detailed cash flow problems regarding ULS's

exhausted $3 million line of credit and the need for another $1 million credit.  Ganley Report, A-

423.  Nonetheless, on September 26, 2018, the ULS board passed a budget that included

Trotter's and Johnsten's compensation.  Meeting Minutes, B-439.  The board also approved an

organizational chart that included Trotter and Johnsten.  Green Dep. 181:4-182:16, B-48-49;

Chart, B-295.

ULS argues that Ganley's report anticipated that ULS's land sale of a battlefield in

January 2019 would yield $3.5 million, which would "pay down as much of the lines of credit as

possible . . .  as well as provide time for [ULS] to live into a more balanced budget going

forward."  Ganley Report, A-423.  In January 2018, ULS agreed to sell the battlefield to a

potential buyer, on the contingent basis that the buyer raise money to purchase the land.  Cole

Dep. 22:8-26:4, A-378-81; Ganley Dep. 51:12-17, A-260.  By October 2018, ULS realized its

buyer could not comply.  Cole Dep. 25:9-16, 53:6-54:3, A-380, 382.

Green testified that, after the 2018 budget passed, he learned two additional pieces of

information that confirmed the land sale was in peril, therefore necessitating eliminations of

Trotter's and Johnsten's positions.  Green Dep. 200:15-207:12, B-53-55.  First, Green learned

that the buyer wanted to change its payment structure; second, he learned Ganley had updated

ULS's financial information.  Id.  Green testified he based his October 5, 2018 decision to

terminate Trotter's and Johnsten's employment solely on those two developments.  Id.

However, Emried Cole, a consultant for ULS during the battlefield transaction, testified

the buyer did not propose a new payment structure for the land sale until October 16, 2018—

eight days after Trotter and Johnston had been fired.  Cole Dep. at 35:1-6, B-147.  Cole failed to

recall any proposal to modify the payment structure before then.  Id. at 34:14-36:10, B-147.

Moreover, Ganley did not recall providing updated budget information to Green after the

September 26, 2018 board meeting.  Ganley Dep. at 154:8-18, B-97.  Viewed in the light most

favorable to Trotter and Johnsten, those developments could not have motivated Green's October 5, 2018 decision to fire them. Because there are genuine issues of material fact concerning the timeline of the financial developments that Green claims spurred his termination of Trotter and Johnsten, a reasonable jury could conclude that ULS's explanation is false and a pretext for retaliation. Moore, 461 F.3d at 342; Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981) (employee may demonstrate employer's proffered reason for employment action was not the true reason "by showing that the employer's proffered explanation is unworthy of credence").

       2.     Johnsten

ULS argues Johnsten cannot establish a prima facie retaliation case for eliminating her position because she did not oppose an employment practice.[2] ULS also contends Johnsten cannot establish a prima facie case for retaliatory failure to re-hire her. I disagree.

Protected activity includes the formal filing of charges before the EEOC, "as well as informal protests of discriminatory employment practices . . . and expressing support for co-workers who have filed formal charges." Curay-Cramer, 450 F.3d at 135 (citations omitted). ULS argues Johnsten did not engage in protected activity because she reported racism among students, not employees. S.J. Mot. at 29-31. However, Johnsten sufficiently alleges the following instances of protected activity which ULS did not address because of its misplaced reliance on the manager rule: (1) her April 13, 2018 grievance, concerning ULS's compliance issues and retaliation against her, supra at 4; (2) her participation in the investigation of those grievances, id.; (3) her complaint that claims of racism among ULS staff and students needed

---

[2]    ULS also argues Johnsten did not engage in protected activity, relying on the manager rule. For the reasons already discussed, the manager rule does not apply to this case. See supra at 10-11.

resolution during the September 2018 President's Cabinet meeting, Johnsten Dep. at 146:7-147:5, B-29; and (4) her November 7, 2018 and February 7, 2019 EEOC charges, Interrogatory Responses, B-531.  See Collins v. Kimberly-Clark Pennsylvania, LLC, 247 F. Supp. 3d 571, 598 (E.D. Pa. 2017) ("filing an EEOC Charge of Discrimination is undisputedly a protected activity"); see also Bonson v. Hanover Foods Corp., 451 F. Supp. 3d 345, 357 (M.D. Pa. 2020) ("protected activity . . . extends beyond formal complaints . . . and can include 'informal protests of discriminatory practices, [such as] making complaints to management.'") (quoting Mikell v. Marriott Intern, Inc., 789 F. Supp. 2d 607, 618 (E.D. Pa. 2011)).

ULS contends even if Johnsten engaged in protected activity, she cannot establish a causal relationship between that activity and her termination.  Johnsten alleges two instances of protected activity preceding her termination: (1) her statements at the September 5 and 12, 2018 President's Cabinet meetings that racism persisted at ULS and Green needed to address it, Johnsten Dep. at 146:7-147:5, B-29; and (2) her presentation raising concerns about racism among ULS board members in September 2018, Johnsten Report, B-289-90.

Green decided to terminate Johnsten on October 5, 2018, less than a month after the Cabinet meeting and her report; and ULS declined to interview her for the Director of Admission position in December 2018, about a month after Johnsten filed her November 13 EEOC complaint.  Viewed in the light most favorable to Johnsten, the temporal proximity of those protected activities and adverse employment actions creates an inference of causal connection that survives summary judgment.  See Fasold v. Justice, 409 F.3d 178, 189-90 (3d Cir. 2005) (holding 82 days as sufficient temporal proximity between protected activity and adverse employment action to provide an evidentiary basis for causal connection).

Finally, ULS cites its financial situation as the reason for elimination of Johnsten's position and for not re-hiring her.  S.J. Mot. at 36-38.  As explained above, there is sufficient evidence for a reasonable jury to find that ULS's finances and reorganization are a pretext. Supra at 12-14.

> D.      Hostile Work Environment

ULS seeks summary judgment on Trotter's claim that he was subject to a retaliatory hostile work environment because he cannot show severe and pervasive conduct that detrimentally impacted him or would have detrimentally impacted a reasonable person.  See S.J. Mot. at 38-42.  I disagree.

To prove a retaliatory hostile work environment claim, Trotter must show that: "(1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present."  See Komis v. Secretary of United States Dept. of Labor, 918 F.3d 289, 293 (3d Cir. 2019) (quoting Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)); see also Morgan, 536 U.S. at 116 (plaintiff must show "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.").  "'Severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive."  Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017) (citing Jensen, 435 F.3d at 449 n.3).  Conduct such as "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

16

changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524

U.S. 775, 788 (1998) (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82

(1998)).

ULS argues that Trotter presented only four alleged incidents of a hostile work

environment.  S.J. Mot. at 39.  However, Trotter contends he was subject to severe and pervasive

discrimination and retaliation when: (1) Zimmann falsely accused him of creating a hostile work

environment which Dunlop investigated in April 2018; (2) Dunlop removed Trotter's

supervision of advancement duties and prevented him from participating in Philadelphia

Advancement Team meetings; (3) in April and May 2018, ULS and Dunlop refused to provide

Trotter a copy of their determination that Zimmann's claims against him were unfounded; (4) in

April 2018, Dunlop excluded Trotter from the hiring process of a major gift officer; (5) in a May

11, 2018 letter, Dunlop accused Trotter of poor work performance, referencing events that pre-

dated Dunlop's presidency; (6) in June 2018, Dunlop gave Green a binder of documents

regarding Trotter, including the May 2018 letter; (7) in an August 29, 2018 meeting, Green

halted Trotter's investigation of a racism claim among employees and removed Trotter's

supervision over those employees; (8) in the same meeting, Green exclaimed "Fuck, what the

fuck?" to one of Trotter's comments about the investigation; and (9) in an October 2, 2018

meeting, Green demanded Trotter be quiet and ordered him to leave the room.  Pl. Resp. at 33-

35.

Construing all evidence in a light most favorable to Trotter, a reasonable juror also could

find that the nine instances of discrimination and retaliation over a period of five months

constituted a pervasive hostile work environment.  See Middlebrooks v. Teva Pharmaceuticals

USA, Inc., No. 17-412, 2019 WL 438092, *8 (E.D. Pa. Feb. 4, 2019) (finding "facts sufficient

17

for a jury to reasonably find pervasive discrimination" even though employer did not ridicule or

insult employee, but rather, disciplined and ignored him because of his protected activities).

Trotter has presented enough evidence, "taken as a whole, for the jury to find the discrimination

became pervasive."  Id.

      An appropriate Order accompanies this Opinion.